2015-1324

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

ALPHA TECHNOLOGY U.S.A. CORP.,

Plaintiff-Appellee,

v.

MLSNA DAIRY SUPPLY, INC., and PHIL MLSNA

Defendants-Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN IN 13-CV-870
JUDGE WILLIAM M. CONLEY

---

BRIEF OF DEFENDANTS-APPELLANTS
MLSNA DAIRY SUPPLY, INC. and PHIL MLSNA

MICHAEL T. HOPKINS
HOPKINS LAW FIRM
757 N. Broadway, Suite 201
Milwaukee, WI 53202
(866) 735-0515

Attorney for Defendants-Appellants

April 13, 2015

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Alpha Technology U.S.A. Corp.    v.    Mlsna Dairy Supply, Inc.

No. 15-1324

## CERTIFICATE OF INTEREST

Counsel for the ~~(petitioner)~~ (appellant) ~~(respondent)~~ ~~(appellee)~~ ~~(amicus)~~ ~~(name of party)~~

Mlsna Dairy Supply, Inc. & _____ certifies the following (use "None" if applicable; use extra sheets if necessary): Phil Mlsna

1.      The full name of every party or amicus represented by me is:

Mlsna Dairy Supply, Inc.
Phil Mlsna

_____

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

See paragraph 1, supra.

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.  ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Michael T. Hopkins; Hopkins Law Office

_____

February 16, 2015                          /s/ Michael T. Hopkins
_____          _____
          Date                                    Signature of counsel

                                            Michael T. Hopkins
                                   _____
                                            Printed name of counsel

Please Note: All questions must be answered
cc: Attorney Amber N. Davis _____

---

[ Reset Fields ]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………          iii

STATEMENT OF RELATED CASES …………………………          1

JURISDICTIONAL STATEMENT ……………………………          1

STATEMENT OF THE ISSUES ………………..…………..……          2

STATEMENT OF THE CASE …………………..…………          3

STATEMENT OF FACTS …………………………..………..          4

    A. The Trial Court's Denial of Mlsna's
    Request for Attorney's Fees ……………………..………          4

    B. Claimed Invention and the Critical Date …….……..          6

    C. The Puli F50 Teatscrubber ………………………..…          7

    D. Invalidating Third Party Public Use ………………..          8

    E. Mr. Dole's Knowledge of Drake's Invalidating
    Use of Claimed Invention ……………………………..…          12

SUMMARY OF THE ARGUMENT …………………..……          17

ARGUMENT …………………………………..…………….…          20

    A. Standard of Review ………………………………          20

    B. The Trial Court Abused its Discretion by Failing to
    Consider the "Totality of the Circumstances" in Denying
    Mlsna's Request for Attorney's Fees Pursuant to 35 U.S.C.
    §285 When it Neglected, by its Own Admission, to
    Consider an Invalidating Third-Party Public Use of the
    Claimed Invention Known to the Inventor and Not
    Disclosed to the Patent Office …………………….          21

C. The Trial Court Abused its Discretion in Denying
Mlsna's Request For Attorney's Fees Pursuant to 35 U.S.C.
§285 When It Found the Case "Not Exceptional" Based
Upon Mlsna's Summary Judgment Submissions, Thereby
Granting Alpha Tech Summary Judgment Sua Sponte
Without Prior Notice, Trial or Evidentiary Hearing, and
Without Applying the Proper Summary Judgment
Standards, Especially Where Discovery Continued
for Eleven Weeks After Defendants Moved for
Summary Judgment ……………………………..           27

D. The Trial Court Abused its Discretion in Denying
Mlsna's Request for Attorney's Fees Pursuant to 35 U.S.C.
§285 When it Failed to Consider the "Totality of the
Circumstances" While Applying the Preponderance of
the Evidence Burden of Proof ……………………           33

CONCLUSION AND STATEMENT OF RELIEF SOUGHT           35

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*Boston Scientific Corp. v. Johnson & Johnson*,
    647 F.3d 1353 (Fed. Cir. 2011) …………………………………………… 20

*Celotex Corporation v. Catrett,*
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) …..….……. 19, 31, 32

*Coleman v. Donahoe,*
    667 F.3d 835 (7th Cir. 2012) ……………….……………………………….. 30

*Eltech Systems Corp. v. PPG Industries, Inc.*,
    903 F.2d 805 (Fed. Cir.1990) …………………………………..……. 23

*Eolas Technologies Inc. v. Microsoft Corp.*,
    399 F.3d 1325 (Fed. Cir. 2005) ……………………………….….…. 25

*Fin Control Systems Pty, Ltd. v. Oam, Inc.,*
    265 F.3d 1311 (Fed. Cir. 2001) ……………………………….……. 19, 32

*Frolow v. Wilson Sporting Goods Co.*,
    710 F.3d 1303 (Fed. Cir. 2013) ……………………………..……. 30

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    572 U.S. ___, 134 S. Ct. 1744, 188 L. Ed. 2d 829 (2014) ……………… 20

*Kilopass Tech., Inc. v. Sidense Corp.*,
    738 F.3d 1302 (Fed. Cir., 2014) ……………………………..…… 21, 34

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
    690 F.3d 1354 (Fed. Cir., 2012) ……………………………..……. 30

*Netscape Communications Corp. v. Konrad*,
    295 F.3d 1315 (Fed. Cir., 2002) ……………………………………. 25

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
    572 U.S. ____, 134 S.Ct. 1749, 188 L. Ed. 2d 816 (2014)……18, 22, 23, 27,
                                                                 33, 34

*Ohio Willow Wood Co. v. Alps S., LLC,*
    735 F.3d 1333 (Fed. Cir., 2014) ………………………….……...… 24, 34

*Ormco Corp. v. Align Tech., Inc.,*
    498 F.3d 1307 (Fed. Cir. 2007) ……………………………………… 20, 21

*Renda Marine, Inc. v. United States,*
    509 F.3d 1372 (Fed. Cir. 2007) …………………………….…………… 20

*Warner-Lambert Co. v. Teva Pharmaceuticals USA,*
    418 F.3d 1326 (Fed. Cir., 2005) ……………………………………..... 30

## STATUTES

28 U.S.C. §1295 ………………………………………………………… 1

28 U.S.C. §1338 ……………………………………………………….. 1

35 U.S.C. §100 (Note) ………………………………………………… 6

35 U.S.C. §102 ……………………………….. 5, 6, 7, 18, 19, 24, 25, 26, 28, 35

35 U.S.C. §285 ………………… 2, 4, 5, 17, 18, 20, 21, 22, 23, 27, 30, 33, 34, 35

## RULES

Rule 11, Fed.R.Civ.P. ………………………………………………… 23

## STATEMENT OF RELATED CASES

No appeal in or from the civil action in the district court which is the subject of this appeal, or from any judgments or orders entered therein was previously or currently is before this or any other appellate court.

Mlsna Dairy Supply, Inc. and Phil Mlsna, Defendants-Appellants, are unaware of any case pending before this or any other court which will directly affect or be directly affected by the Court's decision in the instant appeal.

## JURISDICTIONAL STATEMENT

This is an appeal from final judgment entered by the United States District Court for the Western District of Wisconsin, Judge William M. Conley, on January 9, 2015. Jurisdiction in the trial court was based on 28 U.S.C. §1338(a).

Appellants timely filed their *Notice of Appeal* on February 6, 2015. This Court's jurisdiction is based on 28 U.S.C. §1295, which provides for jurisdiction over a final judgment from a U.S. District Court in patent cases where jurisdiction in the trial court was based on 28 U.S.C. §1338.

# STATEMENT OF THE ISSUES

1. Did the trial court abuse its discretion by failing to consider the "totality of the circumstances" in denying Mlsna's request for attorney's fees pursuant to 35 U.S.C. §285 when it neglected, by its own admission, to consider an invalidating third-party public use of the claimed invention known to the inventor and not disclosed to the patent office?

2. Did the trial court error in denying Mlsna's request for attorney's fees pursuant to 35 U.S.C. §285 when it found the case "not exceptional" based upon Mlsna's summary judgment submissions, thereby granting Alpha Tech summary judgment sua sponte without trial or evidentiary hearing, especially where discovery continued for 11 weeks after Defendants moved for summary judgment?

3. Did the trial court abuse its discretion in denying Mlsna's request for attorney's fees pursuant to 35 U.S.C. §285 when it failed to consider the "totality of the circumstances" based upon the preponderance of the evidence burden of proof?

## STATEMENT OF THE CASE

Alpha Technology U.S.A. Corporation (hereinafter "Alpha Tech") commenced this case for infringement of patent 8,402,920 against Mlsna Dairy Supply and Phil Mlsna (hereinafter collectively referred to as "Mlsna") in the Middle District of Florida on July 15, 2013.[1] Following the granting of Mlsna's motion to dismiss for lack of personal jurisdiction,[2] the case was transferred to the Western District of Wisconsin on December 11, 2013.[3]

The Case Management Order, as amended, provided that dispositive motions were to be filed by August 1, 2014, and discovery was to be concluded by October 15, 2014.[4] Consequently, Mlsna filed a motion for summary judgment and Alpha Tech filed a motion for claim construction on August 1, 2014.[5] These motions were fully briefed by September 8, 2014.[6] The parties concluded discovery on October 22, 2014.[7]

---

[1] Dkt. 1

[2] Dkt. 26

[3] Dkt. 28, Order granting the parties' Joint Motion to Transfer (Dkt. 27).

[4] The original Case Management Order (CMO) in the Western District of Wisconsin was entered on 2/7/14 (Dkt. 42). This CMO was amended when the court consolidated the instant action with a companion case on 6/6/14 (Dkt. 47), and adopted the CMO from the companion case to govern. The companion case was resolved prior to entry of judgment in this case.

[5] Dkt. 50, 49

[6] Dkt. 77, 78

[7] By mutual agreement between the parties, discovery was extended for one week so Alpha Tech could depose Mlsna's liability expert.

Trial was then scheduled to commence on March 30, 2015.[8]

However, on December 4, 2014 Alpha Tech filed a motion to dismiss for lack of subject matter jurisdiction, accompanied by two comprehensive covenants not to sue.[9] Mlsna did not object to dismissal, but argued in response that it was entitled to an award of attorney's fees under 35 U.S.C. §285.[10] Mlsna asserted that a determination of whether defendants were entitled to fees should be decided based upon the pending summary judgment motion, or if not dispositive (i.e., if a material issue of fact existed), "following trial of this issue."[11]

The district court granted Alpha Tech's motion to dismiss and denied Mlsna's request for an award of attorney's fees under §285 by *Opinion and Order* dated January 8, 2015.[12] *Judgment* was entered on January 9, 2015.[13] Mlsna filed a *Notice of Appeal* on February 6, 2016.[14]

## STATEMENT OF FACTS

### A.
### The Trial Court's Denial of Mlsna's Request for Attorney's Fees

In its January 8, 2015 *Decision and Order* the Court denied Mlsna's request for attorney's fees pursuant to 35 U.S.C. §285, finding that insufficient evidence of

---

[8] Dkt. 47 and "reset" note following.
[9] A0329
[10] A0364-0365
[11] A0368
[12] A0002
[13] A0001
[14] Dkt. 94

"inequitable conduct" had been presented by Mlsna on summary judgment and, therefore, the court could not determine that the case was "exceptional."[15]

In reaching this conclusion, the Court noted that "Mlsna's entire discussion of the right to fees under §285 consists of approximately one page in their opening summary judgment brief."[16] The Court then summarized what it considered Defendants' argument supporting their claim of inequitable conduct.

> As detailed in other parts of their summary judgment briefing and supporting materials, defendants specifically contend that Dole failed to disclose a Puli F50 teatscrubbing system as known prior art to the United States Patent Office, and did so with deceptive intent.[17]

The Court also questioned whether the disclosure of the F50 was even material during prosecution based upon Dole's disclosure of the Vecchio prior art patent application.[18] Although the court did mention the Puli installation at Drake Dairy, it did so in reference to Dole's failure to disclose the Puli F50 as an "obviousness" prior art reference, rather than as an invalidating third party public use under 35 U.S.C. §102(b).[19] This omission is significant.

As will be shown, the distinction between an inventor's failure to disclose known prior art during prosecution and her failure to disclose an invalidating public use is critical, since in the first instance the question of materiality is

---

[15] A0005
[16] A0004
[17] *Id.*
[18] A0005
[19] *Id.*

tantamount. In the latter instance, the third party public use in and of itself prior to the critical date renders the claimed invention unpatentable, without more.[20] In other words, if Mr. Dole had disclosed Drake's known use of the patented invention to the Patent Office, his application would have been rejected out of hand.

Thus, in deciding this case was not "exceptional" the Court, by its own admission, failed to consider Defendants' arguments concerning the §102(b) invalidating third party public use of the claimed invention, and the inventor's inequitable conduct associated therewith, discussed in 21 pages of Mlsna's summary judgment briefs,[21] not to mention the related declarations and exhibits.[22] The trial court did not consider the "totality of the circumstances" in denying Mlsna's request for fees.

**B.**
**Claimed Invention and the Critical Date**

Kevin Dole (named inventor and President of Alpha Tech) filed a non provisional patent application (no. 12/883,359) with the United States Patent Office on September 16, 2010 for an invention entitled "SYSTEM AND

---

[20] 35 U.S.C. §102(b). Since the application for the '920 patent was filed prior to the effective date of the Leahy-Smith America Invents Act (AIA), the pre AIA version of §102 of the Patent Act applies. See 35 U.S.C. §100 (note). All future references to §102 will be to the pre-AIA version.
[21] A0113-0114; A0123-0129; A0317-0328
[22] In particular, see Dkt. 53, Beuchel Declaration; and Dkt. 54, Drake Declaration

METHOD FOR CLEANING TEATS OF A MILK-PRODUCING ANIMAL," which ultimately issued as the '920 patent at issue in this litigation.[23] Mr. Dole's invention is colloquially referred to as a "teat scrubbing system," or a "teatscrubber."

Alpha Tech has alleged Mlsna infringed claim 1 of the '920 patent by manufacturing and selling its "MTech" teatscrubbing system.[24]

The '920 patent does not claim priority benefits under any foreign or domestic patent or patent application.[25] Consequently, the critical date for purposes of public use invalidation was September 16, 2009.[26]

## C.
## The Puli F50 Teatscrubber

LDS Acquisition Corp. is a dairy and farm supply company located in Chilton, Wisconsin.[27]

The Puli F50 and F60 teatscrubbing systems were/are manufactured by Puli-Sistems, srl., an Italian company.[28]

From approximately 2005 through approximately 2009, LDS was an authorized U.S. dealer of the Puli F50 and Puli F60 teatscrubbing systems, both of

---

[23] A0008
[24] Dkt. 37, Amended Complaint, p. 6, ¶24; Dkt. 49, Alpha Tech's motion for claim construction, p. 2
[25] A0008
[26] 35 U.S.C. §102(b)
[27] A0041, ¶2
[28] A0042, ¶5

which were imported by LDS and sold to dairy farms.[29] LDS would typically install, service and maintain the Puli teatscrubbing systems for its dairy clients after sale.[30]

LDS sold and installed its first Puli F50 teatscrubbing system at Siemer's Dairy, located in Newton, Wisconsin, in late 2004 or early 2005.[31]

In March 2008 LDS sold and installed an F50 teatscrubbing system at Hoard's Dairy, located in Fort Atkinson, Wisconsin.[32] Kevin Dole was present at Hoard's Dairy in 2008 after LDS installed the F50 teat scrubbing unit there.[33]

Prior to September 16, 2009 (the critical date) the Puli F50 and F60 teatscrubbing systems, without more, disclosed each and every element contained in Claim 1 of the '920 patent except for the use of chlorine dioxide as a disinfectant solution.[34]

## D.
## Invalidating Third Party Public Use

Drake Dairy, Inc. owns and operates a dairy farm in Elkhart Lake, Wisconsin.[35]

---

[29] A0041-0042, ¶¶4, 5
[30] A0041, ¶4
[31] A0043, ¶¶13, 14
[32] A0043, ¶¶11, 12; A0047-0048
[33] A0043, ¶¶11, 12; A0049-0050
[34] A0042, ¶¶6-10; A0088-0090, ¶¶2-6; A0094-0106
[35] A0043, ¶15; A0063, ¶3

In late 2008 or early 2009, LDS discussed with Jim Drake (one of the owners at Drake Dairy), the proposed purchase by Drake Dairy of a Puli F50 teat scrubbing system.[36] LDS offered to install the Puli teatscrubber at Drake Dairy on a 90 day trial period, provided Drake Dairy agreed to purchase the chemical, brushes and other consumable and maintenance items for the system during this time. If at the end of the 90 day trial period Drake Dairy wanted to retain the teatscrubber, it would purchase the system from LDS for a pre-negotiated price. In the event Drake Dairy did not wish to retain the teatscrubber after the 90 day trial period, LDS would remove the system at no additional charge.[37]

Sometime during the first half of 2009, Drake Dairy contracted with LDS to install a Puli F50 teatscrubbing system at the terms described above.[38] LDS installed the system during the month of July 2009.[39]

The F50 teatscrubber was operational and in use by Drake Dairy's milkers on or about August 1, 2009.[40]

The Puli F50 teatscrubber was in continual use (other than for periods of maintenance and repair) at Drake Dairy until late October 2009, when the system was removed by LDS at Jim Drake's request.[41]

---

[36] A0043, ¶18; A0066, ¶18
[37] Id.
[38] A0044, ¶19; A0066, ¶19
[39] A0044, ¶20; A0053-0062; A0066, ¶20
[40] Id.
[41] A0044, ¶21; A0066, ¶20

The disinfectant solution used in the Puli F50 teatscrubbing system at Drake Dairy was chlorine dioxide, which was mixed in small batches on the dairy prior to its use in the F50 system.[42]

LDS sold Drake Dairy separate drums of sodium chlorite and critic acid, which were combined to create the chlorine dioxide.[43] This is the same "disinfectant solution" claimed by Dole for use with the '920 patent's teatcrubber.[44] Because no additives of any kind were added to the sodium chlorite or citric acid, either separately or after they were combined, the chlorine dioxide delivered to the handheld scrubbing unit of the Puli F50 teatscrubber at Drake Dairy was a non-foaming aqueous liquid, with the consistency of water.[45]

During the entire period of time during which the F50 teatscrubber was operated at Drake Dairy, only chlorine dioxide was used as the disinfectant solution in the Puli F50 teatscrubbing system.[46]

On August 6, 2009 Drake Dairy, Inc. was invoiced and paid for the initial drums of sodium chlorite concentrate and citric acid concentrate it purchased from LDS for use in the Puli F50 teatscrubbing system.[47]

---

[42] A0044-0045, ¶¶22, 25; A0067-0068 ¶¶22-25
[43] A0044, ¶22; A0067-0068, ¶¶23-25
[44] A0008, Abstract; A0017, Col. 2, L. 33-43; A0022, Col. 11, Claim 1
[45] A0044-0045, ¶¶22, 26; A0068, ¶26
[46] A0045, ¶27; A0069, ¶¶30, 31
[47] A0045, ¶28; A0068, ¶29; A0070-0075

After consuming the initial drums of sodium chlorite and citric acid used in the Puli F50 teat scrubbing system, Drake Dairy, Inc. purchased identical quantities of both chemicals during the first half of September 2009.[48]

After the Puli teat scrubbing system was removed from Drake Dairy's milking parlor in late October 2009, LDS also removed the unused sodium chlorite concentrate and citric acid concentrate which was used with the system to create the chlorine dioxide disinfectant. LDS issued a credit memo dated October 22, 2009 to Drake Dairy, Inc. for 4 gallons of each chemical which was returned with the Puli F50 teatscrubber.[49]

When in use at Drake Dairy, the Puli F50 teatscrubber performed as advertised and cleaned, disinfected and dried the cows' teats prior to milking.[50] Somatic cell counts (a measure of the "udder" health of the cows) in the milk harvested during the period when the Puli F50 teatscrubber was used at Drake Dairy remained at its historical low levels.[51] Additionally, the chlorine dioxide did not injure the cows' teats, was effective (low somatic cell counts), and seemed to work well.[52]

---

[48] A0046, ¶29; A0069, ¶30; A0076-0086
[49] A0046, ¶30; A0069, ¶32; A0087
[50] A0067, ¶21
[51] A0063-0064, ¶¶5, 6; A0067, ¶21
[52] A0068, ¶28

However, Jim Drake decided not to purchase the Puli F50 teatscrubbing system since the repair and maintenance costs (brushes, gears, motors, cables, etc.) seemed high, as the hand held scrubber unit used plastic gears to drive the brushes. The plastic gears were prone to failure, and the brushes had to be replaced on a regular basis. Once the repair and maintenance costs were added to the purchase price, Mr. Drake was not convinced the investment would be worth the return.[53] Mr. Drake attributed the excessive wear and tear on the brushes and gears to the sand bedding used in the cow barn, which acted as an abrasive in the handheld teatscrubbing unit.[54]

As used at Drake Dairy prior to September 16, 2009, the Puli F50 teatscrubbing system disclosed each and every element contained in Claim 1 of the '920 patent at issue in this litigation.[55]

### E.
### Mr. Dole's Knowledge of Drake's Invalidating Use of Claimed Invention

Mr. Dole was well aware of the mechanical elements and operation of the Puli F50 teatscrubber at the time he filed the '359 application. Alpha Tech sold at least four (4) Puli F50 teatscrubbing systems between July 2008 and May 2009, to four separate dairy farms located in Wisconsin, Minnesota, Texas and Indiana.[56]

---

[53] A0067, ¶21

[54] A0290, p.21:13 to p. 23:6

[55] A0042, ¶¶5-10; A0044, ¶22; A0088-0090, ¶¶2-6; A0094-0106; A0066-0069, ¶¶20-31

[56] A0090, ¶7; A0107-0110

After Alpha Tech sold these Puli F50s, it continued to supply the dairies with spare parts and consumable items such as brushes and its "Alphacide" brand disinfectant.[57]

At the time he filed the '359 patent application, Kevin Dole was also aware that LDS had installed a Puli F50 teatscrubbing system at Drake Dairy in 2009, and that LDS had been mixing sodium chlorite and citric acid at Drake Dairy to create chlorine dioxide for use as the disinfectant solution in said teatscrubbing system.[58]

On April 12, 2010 Joe Leitner of LDS sent the following email message to Kevin Dole:

> Hi Kevin,
>
> How are you doing with sales?
> We have struggled with the last 2 installs. Both customers decided not keep the scrubber system. Have you made any more improvements to help with the sales of the units?

Mr. Dole responded on April 13, 2010:

> Joe:
>
> We are doing just OK, but in In a word our business is "slow".
>
> I knew you put a system in at Drake's I think. My service guy Kodey went by and saw it. When he described how the chemical was being fed, I told him to get out of there and don't look back. Its a miracle that farm didn't explode. If not fed correctly, that chemical creates an explosion hazard at the levels you were feeding it in. Its probably a

---

[57] A0091, ¶10
[58] A0092, ¶19; A0111

blessing in disguise they decided against it, because it was just a matter of time.[59]

Mr. Leitner specifically referred to sales of the "scrubber system." Mr. Dole had enough knowledge of LDS's activity at Drake Dairy to comment on the actual chemical used there as the disinfectant in the scrubber system. Additionally, Mr. Dole is the one to reference Drake's - not Mr. Leitner. Thus, almost six months after the F50 was removed from Drake Dairy by LDS, Mr. Dole recalled the installation in detail.

Mr. Dole attempted to explain away his failure to disclose the Drake installation to the Patent Office in a declaration filed in response to Mlsna's summary judgment motion.[60] Mr. Dole's declaration does little to resolve the issue of whether he committed fraud on the patent office by not disclosing the Drake installation during prosecution of the '359 application. In fact, it raises more questions than it answers.

Mr. Dole indicates he became aware of the Drake installation when he was queried by a an attendee at the World Dairy Expo in 2009.[61] His narrative continues:

> …………….. I directed my maintenance person to look up the address of Drake Dairy and go by and see what they were using in the near future.

[59] A0111
[60] Dkt. 72
[61] A0237, ¶24

My maintenance person contacted the dairy and went by and visited. He inspected the unit but didn't have any cell service so he went outside to call me. He relayed that it indeed was a Puli-Sistem, but it had been modified to utilize a water powered Dosatron pump to meter in chemical. He indicated that the chemicals being used were 25% Sodium Chlorite and 25% Citric Acid being mixed together in a small vessel. I told him to immediately leave the premises because the manner in which the chemicals were being mixed posed an explosion hazard. He did not tell me whether or not additives were used with those chemicals.

I recall wondering why they were using those particular chemicals at those dangerous proportions. I quickly dismissed LDS's scheme as risky, potentially dangerous to humans and animals and had no chance of working. I actually laughed at how ridiculous of an effort and misapplication it really was.

After that discussion, I didn't think of the occurrence until Joe Leitner's email of April 2010 telling me their last two farms had been abject failures. Since there had been no other news or rumors of any other farms being sold teatscrubbing systems, I just assumed one of those must have been Drake' s. I still don't know the identity of the other dairy.

***I admit I knew these facts before I applied for the '920 patent on September 16, 2010***, but being that it was my first patent application and I was ignorant to all of the procedures and protocols that went along with it, I honestly did not even think about Drake's when filing the patent application. When I retained Robert Wolter, Esq. to help in the drafting of the patent application, the events at Drake's simply slipped my mind ***and*** I honestly didn't even think it was relevant because the solution they were using was so different than mine. (Emphasis added).[62]

---

[62] A0237-0238, ¶¶24-28

At the time Mr. Dole prepared the declaration, five years after the Puli system was removed from Drake's Dairy, he remembered:

1. His service person did not have cell reception (presumably in the barn at Drake's), and went outside to call Mr. Dole.

2. The Puli-Sistem, had been modified to utilize a water powered Dosatron pump to meter in chemical.

3. The chemicals being used were 25% Sodium Chlorite and 25% Citric Acid - *the same base chemicals disclosed in the '920 patent for the creation of chlorine dioxide.*

4. The chemicals were being mixed in "a small vessel."

5. The chemicals posed an explosion hazard.

6. The service person did not tell Mr. Dole whether additives were being mixed with the chemicals.

7. The chemicals were hazardous to humans and animals.

8. He thought the application was amusing.

9. Drake's installation was still on his mind months later when he received an email from Joe Leitner.

Mr. Dole wanted the trial court to believe that this whole episode merely slipped his mind when prosecuting the '359 application. To this point, the last sentence of paragraph 28 is most telling:

When I retained Robert Wolter, Esq. to help in the drafting of the patent application, the events at Drake's simply slipped my mind ***and*** I

16

honestly didn't even think it was relevant because the solution they were using was so different than mine. (Emphasis added).[63]

Mr. Dole first states that while prosecuting the '359 application "the events at Drake's simply slipped my mind." He then goes on to state, however, that "[he] honestly didn't even think it was relevant because the solution they were using was so different than mine." Either the Drake installation slipped his mind during the prosecution, or he considered it and failed to disclose it after unilaterally deciding it was not "relevant because the solution they were using was so different than mine." Mr. Dole cannot have it both ways. He either forgot about this episode or made the conscious decision to refrain from disclosing it to the patent office. One cannot tell which occurred from his rendition.

Additionally, Drake was using chlorine dioxide as the disinfectant solution in the Puli teatscrubber installed on his dairy farm; the exact same disinfectant solution claimed in the '920 patent. Mr. Dole's avowal to the court that Drake's solution "was so different than mine" is patently false.

## SUMMARY OF THE ARGUMENT

In its January 8, 2015 *Opinion and Order* the court denied Defendants' request for fees pursuant to 35 U.S.C. §285, finding insufficient evidence was presented of inequitable conduct and hence the court could not determine this was an "exceptional case" under the Patent Act. In reaching this conclusion, the court

---

[63] A0238, ¶28

noted that "Mlsna's entire discussion of the right to fees under §285 consists of approximately one page in their opening summary judgment brief."[64] The court then summarized what it considered Defendants' argument supporting their claim of inequitable conduct.

> As detailed in other parts of their summary judgment briefing and supporting materials, defendants specifically contend that Dole failed to disclose a Puli F50 teatscrubbing system as known prior art to the United States patent Office, and did so with deceptive intent.[65]

The court also questioned whether the disclosure of the F50 was even material during prosecution based upon Dole's disclosure of the Vecchio prior art patent application.[66]

Whether because of poor organization by counsel for Defendants in drafting the summary judgment brief and supporting material, or for some other reason unknown to Defendants at this time, in reaching its decision the Court failed to considered Drake Dairy's §102(b) invalidating third party public use of the claimed invention more than one year prior to Dole's filing of the application for the '920 patent, which use was well known to Mr. Dole. Thus, in making its §285 determination, the court abused its discretion by failing to consider the "totality of the circumstances," contrary to *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. ____, 134 S.Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014).

---

[64] A0004
[65] *Id.*
[66] A0005

Also, the distinction between an inventor's failure to disclose known prior art during prosecution and her failure to disclose an invalidating public use is critical, since in the first instance the question of materiality is tantamount. In the latter instance, the third party public use in and of itself prior to the critical date renders the claimed invention unpatentable in the first instance.[67] In other words, if Mr. Dole had disclosed Drake's known use of the patented invention to the Patent Office, his application would have been rejected out of hand.

Secondly, in denying Mlsna's request for attorney's fees and finding the case was not exceptional as a matter of law based upon Mlsna's summary judgment submissions, the court granted Alpha Tech summary judgment on this issue sua sponte. In doing so, however, the court did not provide Mlsna with any advance notice, nor did the court provide Mlsna an opportunity to present additional evidence, contrary to *Celotex Corporation v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*, and Fin Control Systems Pty, Ltd. v. Oam, Inc.,* 265 F.3d 1311, 1321 (Fed. Cir 2001). Additionally, in granting Alpha Tech summary judgment on the issue of fees based upon Mlsna's summary judgment submission, the court failed to apply the proper summary judgment standards. The court abused its discretion on both counts.

---

[67] 35 U.S.C. §102(b)

Lastly, in denying Mlsna's request for attorney's fees the trial court analyzed the inventor's conduct during examination of the '920 patent at issue in light of the clear and convincing burden of proof, even though the question before it was whether this case was exceptional under 35 U.S.C. §285, which must be considered using the preponderance of the evidence burden of proof. This was also an abuse of discretion.

## ARGUMENT

### A.
### Standard of Review

An abuse-of-discretion standard is applied in reviewing all aspects of a district court's 35 U.S.C. §285 determination of whether a case is exceptional, and whether a party is entitled to an award of attorney's fees. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. ___,  134 S. Ct. 1744, 1749, 188 L. Ed. 2d 829 (2014).

However, a district court necessarily abuses its discretion when it misapplies the law or relies on erroneous legal conclusions. *Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1379 (Fed. Cir. 2007).

The Federal Circuit "review[s] a district court's grant of summary judgment de novo, reapplying the appropriate standard applicable before the district court." *Boston Scientific Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1361 (Fed. Cir. 2011). In reviewing a summary judgment determination, "all facts must be

20

construed in the light most favorable to the nonmoving party." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1318 (Fed. Cir. 2007).

<div align="center">

**B.**

**The Trial Court Abused its Discretion by Failing to Consider the "Totality of the Circumstances" in Denying Mlsna's Request for Attorney's Fees Pursuant to 35 U.S.C. §285 When it Neglected, by its Own Admission, to Consider an Invalidating Third-Party Public Use of the Claimed Invention Known to the Inventor and Not Disclosed to the Patent Office.**

</div>

35 U.S.C §285 provides that "the court in exceptional cases may award reasonable attorney fees to the prevailing party." The Federal Circuit has explained the purpose behind Congress's enactment of §285.

> Thus, a central aim of §285, as well as its predecessor, is to prevent an alleged infringer from suffering a "gross injustice." The injury to the alleged infringer is the focus—an injury that can occur regardless of a plaintiff's state of mind. In the same vein, we have stressed that §285 "is remedial and for the purpose of compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust ... to require it to bear its own costs." *Highmark,* 687 F.3d at 1310. Again, it is clear that the aim of §285 is to compensate a defendant for attorneys' fees it should not have been forced to incur. The aim is not to punish a plaintiff for bringing those claims—an inquiry that legitimately would involve inquiry into the plaintiff's state of mind. Thus, relevant legislative history and our own case law at least suggest that we should focus on the "gross injustice" to the defendant, if any, and not necessarily on the plaintiff's subjective state. *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir., 2014).

The Supreme Court recently defined the term "exceptional" as used in §285, and outlined the analysis which should be undertaken in determining when an award of fees is appropriate.

<div align="center">21</div>

We hold, then, that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances. As in the comparable context of the Copyright Act, "'[t]here is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'" *Fogerty* v. *Fantasy, Inc.*, 510 U. S. 517, 534 (1994). *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. ____, 134 S.Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014).

Thus, the Supreme Court has held that when considering a motion for fees under §285, a court must consider the "totality of the circumstances" on a case by case basis. Additionally, the Court stressed that there is "no precise rule or formula" - no "bright line test" by which to make a determination. However, by way of example the Court did set forth several nonexclusive factors a court could consider.

In *Fogerty* v. *Fantasy, Inc.*, 510 U. S. 517 (1994), for example, we explained that in determining whether to award fees under a similar provision in the Copyright Act, district courts could consider a "nonexclusive" list of "factors," including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.*, at 534, n. 19 (internal quotation marks omitted). *Octane Fitness*, 134 S.Ct. at 1756, fn. 6.

The Court further explained that a party against whom an award of fees is made need not have engaged in otherwise sanctionable conduct (such as Rule 11 or discovery violations) for a case to be found "exceptional."

> But sanctionable conduct is not the appropriate benchmark. Under the standard announced today, a district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so "exceptional" as to justify an award of fees. *Octane Fitness*, 134 S.Ct. at 1756-1757.[68]

In the case at bar the court failed to consider the "totality of the circumstances" in denying Mlsna's request for fees under §285. The court also failed to appreciate the import disclosure of a §102(b) third party public use would have on the issue of patentability of the claimed invention in the first instance.

In its *Decision* the court was clearly proceeding under the mistaken belief that Mlsna's only claim of inequitable conduct was that "Dole failed to disclose a Puli F50 teatscrubbing system as known prior art to the United States Patent Office, and did so with deceptive intent."[69] The court further held that the use of the Puli F50 at Drake's was not "material" to the issue of patentability, since "Dole

---

[68] The Federal Circuit's long standing rule concerning a patentee's "infringement assessment" when considering an award of fees under §285 seems to be in accord. "Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence." *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 811 (Fed. Cir.1990).
[69] A0004

disclosed Puli's commercial use of the very technology embodied in the F50 system, if not that system specifically," and consequently, disclosure of Drake's use was superfluous to a determination of "obviousness" by the examiner.[70] In other words, the court found Dole's explanation for failing to disclose Drake's use to the patent office ("it was not relevant") acceptable in light of the "but-for" materiality requirement which must be met to prove inequitable conduct for failing to disclose known prior art.

> Typically, an allegation of inequitable conduct before the PTO requires proof that the patentee withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing. *Therasense,* 649 F.3d at 1291. Because the analysis of this *but-for* materiality requirement is from the perspective of the PTO, we apply the preponderance of the evidence standard in assessing whether the withheld or misrepresented information would have blocked patentability. *Id.* at 1291–92. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1345 (Fed. Cir., 2014).

However, the question of "materiality" does not come into play when considering whether an inventor engaged in inequitable conduct for failing to disclose a §102(b) invalidating third party public use of the claimed invention. Section 102(b) provides:

> A person shall be entitled to a patent unless —
>
> …………………………………

--------

[70] A0005-0006

24

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, …

Invalidating uses included in the §102(b) bar to patentability include public uses by third parties who are "under no limitation, restriction or obligation of secrecy to the inventor." *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir., 2002). See also *Eolas Technologies Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1334 (Fed. Cir., 2005).

Thus, had Mr. Dole disclosed Drake's pre-critical date use of the Puli F50 teatscrubbing system (which utilized chlorine dioxide as the disinfectant solution) to the patent office during prosecution, the '920 patent would not have issued; §102(b) would have prohibited patenting of the claimed invention, without more. In light of this absolute impediment to patentability, Mr. Dole's accepted excuse for failing to make this disclosure becomes not only deficient, but suspect.

Mr. Dole indicates in his declaration that he in fact knew about Drake's at the time he filed the application for the '920 patent, and after retaining patent counsel he "didn't even think it was relevant."[71] Once "materiality" of the disclosure is no longer relevant to the determination of patentability or whether Mr. Dole committed fraud on the patent office, the excuse of "I didn't think it was relevant" begs the question of why Drake's use was not disclosed. The absence of

---

[71] A0238, ¶28

"materiality" of the Drake disclosure also undermines the court's reasoning for denying Mlsna's fee request. The court concluded its *Decision* by stating:

> In his sworn affidavit, Doles [*sic*] plausibly avers that: (1) he had forgotten the Puli F50 system was in use at Drake Dairy at the time he filed the patent application; (2) even if recalled, he did not think it was relevant in light of the different solutions used with that system; and (3) the Puli F50 system was covered in his disclosure of the Vecchia patent application and Puli's use of that technology. (Declaration of Kevin Dole (dkt. #72) ¶¶ 28, 30.) Defendants offer *no* evidence on summary judgment that rebuts this basic evidence as to both Dole's intent and materiality of the F50 system in particular ……..
>
> ***More importantly, plaintiff has put forth sufficient evidence at summary judgment to undermine any finding that Dole's failure to disclose the Puli F50 system in particular was material in light of his disclosure of the Vecchia Application***.(Emphasis supplied).[72]

However, Dole's failure to disclose the §102(b) use of the Puli system with chlorine dioxide at Drake's would certainly be germane to the issue of patentability in the first instance.

By neglecting to recognize and appreciate Mlsna's discussion of Drake's invalidating third party public use of the claimed invention, the court failed to consider the "totality of the circumstances" in denying Mlsna's request for fees. Mr. Dole's proffered excuse for this omission takes on nefarious overtones when viewed through the prism of §102(b)'s absolute bar to patentability, rather than the

---

[72] A0005-0006

context of materiality inherent in an obviousness analysis. A proper and timely disclosure by Mr. Dole would have barred issuance of the '920 patent.

Accordingly, the court abused its discretion in denying Mlsna's request for fees under §285 without considering Drake's invalidating public use and the totality of the circumstances as required by the Supreme Court in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. ____, 134 S.Ct. 1749, 188 L. Ed. 2d 816 (2014).

## C.

**The Trial Court Abused its Discretion in Denying Mlsna's Request For Attorney's Fees Pursuant to 35 U.S.C. §285 When It Found the Case "Not Exceptional" Based Upon Mlsna's Summary Judgment Submissions, Thereby Granting Alpha Tech Summary Judgment Sua Sponte Without Prior Notice, Trial or Evidentiary Hearing, and Without Applying the Proper Summary Judgment Standards, Especially Where Discovery Continued for Eleven Weeks After Defendants Moved for Summary Judgment.**

Following Alpha Tech's voluntary dismissal of its patent infringement claims concomitant with its filing comprehensive covenants not to sue, Mlsna requested that the court consider an award of attorney fees, relying on its previous summary judgment submissions or, "if not dispositive, following trial of this issue."[73]

Mlsna had moved for summary judgment of invalidity, alleging inequitable conduct on the part of Kevin Dole, the named inventor on the '920 patent and

---

[73] A0368

27

Alpha Tech's president, for failing to disclose a known invalidating third-party public use of the claimed invention.[74] Mlsna's motion was filed on August 1, 2014.[75] Mr. Dole was not deposed until October 9, 2014, some 10 weeks hence.[76]

Alpha Tech did not file a cross motion for summary judgment on the issue of invalidity, but responded to Mlsna's motion by filing a brief and the declaration of Mr. Dole, presumably to raise a question of fact as to whether Mr. Dole **intended** to commit fraud on the patent office in failing to disclose to the examiner the invalidating §102(b) use at Drake Dairy.[77] It is clear from Mr. Dole's declaration that he was aware of the Drake Dairy installation well before he filed the application for the '920 patent in September 2010.[78]

As an excuse for this omission, Mr. Dole explained:

When I retained Robert Wolter, Esq. to help in the drafting of the patent application, the events at Drake's simply slipped my mind **and** I honestly didn't even think it was relevant because the solution they were using was so different than mine.[79]

*As set forth above, Mr. Dole's statement that the disinfectant solution used at Drake's was "so different than mine" is patently untrue; it is a lie.[80]*

---

[74] Dkt. 50. As explained above, the third party use was of the Puli F50 system installed at Drake Dairy by LDS in July 2009.

[75] *Id.*

[76] A0362

[77] Dkt. 68, 72

[78] A0238, ¶28. Also, see email correspondence between Mr. Dole and Joe Leitner at LDS from April 2010, wherein Dole discusses the Drake installation; A0111.

[79] A0238, ¶28

[80] See footnote 44, supra.

Mr. Dole goes on to proffer mutually exclusive explanations for his dereliction; it "slipped his mind" and he "didn't think it was relevant." Mr. Dole cannot have it both ways, he either forgot about Drake's installation during the two and one-half years the '920 patent was being prosecuted,[81] or he remembered it and unilaterally decided it was not relevant.[82] At best, by virtue of his declaration Mr. Dole created an issue of fact relevant to the scienter issue presented in the fraud determination. At worst he created more problems than he attempted to resolve.

Rather than deny Mlsna's motion for fees based upon the "issue of material fact" created by Mr. Dole's declaration and thereinafter set this matter for hearing or trial, the court found Mr. Dole's contradictory explanations as to why he did not disclose the Drake installation to the patent office legally sufficient on their face. The court then denied Mlsna's request for fees as a matter of law. In other words, the court granted Alpha Tech summary judgment on the issues of inequitable conduct and Mlsna's entitlement to fees, sua sponte. This was done without additional notice or forewarning to Mlsna.

---

[81] A0226-0228

[82] In his declaration, Mr. Dole does not indicate he even discussed the relevancy of the Drake installation with patent counsel.

The trial court's decision is clearly erroneous for two reasons. The first is that it failed to apply the proper summary judgment standards when granting judgment for Alpha Tech.

> Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). At the summary judgment stage, we credit all of the nonmovant's evidence and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Our function is not to "weigh the evidence and determine the truth of the matter" but instead to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. *Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303, 1308 (Fed. Cir., 2013)[83]

In granting Alpha Tech summary judgment on the issues of inequitable conduct and Mlsna's entitlement to attorney's fees under §285, the court did not "credit" the evidence put forth by Mlsna, nor did the court "draw all justifiable inferences" in Mlsna's favor. Rather, the court, without meeting Mr.Dole, assessing his testimony and credibility, or witnessing his adverse examination, instead "weighed the evidence" and "determined the truth of the matter."

---

[83] See also *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012) [when applying summary judgment methodology, the court's "account of the facts therefore is not necessarily true in an objective sense, but reflects the standard that applies to motions for summary judgment."] Additionally, *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1366 (Fed. Cir., 2012), and *Warner-Lambert Co. v. Teva Pharmaceuticals USA*, 418 F.3d 1326, 1335 (Fed. Cir., 2005) concerning summary judgment methodology and the standard of review.

Based upon his own declaration it can be reasonably inferred that Mr. Dole did remember the Puli F50 teatscrubber installation at Drake's during the prosecution of the '920 patent and made the unilateral decision not to disclose it. This inference and an inference of deceptive intent on his part is further bolstered when one considers Dole's email exchange with Joe Leitner from April 2010, wherein Mr. Dole describes the installation in detail,[84] especially when examined in light of the blatant falsehood from Dole's declaration that the disinfectant solution used at Drake's was "so different" than his.

The trial court clearly abused its discretion in weighing this evidence and granting Alpha Tech summary judgment sua sponte.

Secondly, the trial court also abused its discretion by granting Alpha Tech summary judgment on these issues sua sponte, without advanced notice to Mlsna, nor the opportunity to present additional evidence.

> ………. district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence. See 244 U.S.App.D.C., at 167-168, 756 F.2d, at 189 (Bork, J., dissenting); 10A C. Wright, A. Miller, & M. Kane, *Federal Practice*

---

[84] A0111

*and Procedure* § 2720, pp. 28-29 (1983). *Celotex Corporation v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[85]

The trial court granted Alpha Tech summary judgment sua sponte without any advanced warning. The court concluded its final *Decision* by stating that "in light of this undisputed evidence, the court finds no factual basis to hold a hearing before disposing of defendants' remaining request for fees."[86] It then ordered the clerk to enter judgment dismissing all claims and denying Mlsna's request for fees.[87]

This is especially troublesome since at the time Mlsna filed its summary judgment motion discovery was to be continued for another eleven weeks, Mr. Dole was yet to be deposed, and a trial date was pending. Mlsna knew when it moved for summary judgment of invalidity based upon inequitable conduct that if the motion was denied because a material issue of fact was presented, the issue of fraud could be decided at trial. Mlsna could not have anticipated that some four months later Alpha Tech would throw in the towel and file comprehensive covenants not to sue, ending the litigation. Nor in October 2014 when discovery

---

[85] See also, *Fin Control Systems Pty, Ltd. v. Oam, Inc.*, 265 F.3d 1311, 1321 (Fed. Cir 2001) ["….the district court's sua sponte grant of summary judgment of invalidity and unenforceability was procedurally improper because it did not provide the parties with adequate notice or an opportunity for FCS to present evidence and argument in opposition to the motion. Fed. R. Civ. P. 56."]
[86] A0006
[87] A0006-0007

concluded could Mlsna have supplemented its summary judgment submission. All motions were fully briefed at that time.

The trial court erred in granting Alpha Tech summary judgment, sua sponte, on the issues of inequitable conduct and Mlsna's entitlement to attorney's fees under §285, which require differing analyses and burdens of proof.

### D.
**The Trial Court Abused its Discretion in Denying Mlsna's Request for Attorney's Fees Pursuant to 35 U.S.C. §285 When it Failed to Consider the "Totality of the Circumstances" While Applying the Preponderance of the Evidence Burden of Proof.**

The Supreme Court in *Octane Fitness* mandated that a party may establish its entitlement to fees under §285 by the preponderance of the evidence, rather than the theretofore imposed clear and convincing standard.[88] In overturning the *Brooks Furniture* framework for finding a case "exceptional," the high court also stated that an adverse party's conduct does not have to be otherwise sanctionable (as with Rule 11 or discovery violations) to be considered by the court in finding a case "exceptional." *Octane Fitness*, 134 S.Ct. at 1756-1757.

In the instant action the court analyzed Mlsna's request for fees under §285 using the clear and convincing standard of proof.

> Defendants offer *no* evidence on summary judgment that rebuts this basic evidence as to both Dole's intent and materiality of the F50 system in particular, much less meet the clear and convincing

---

[88] *Octane Fitness*, 134 S.Ct. at 1758

evidence standard of demonstrating specific intent to defraud the USPTO in light of those disclosures, nor have they done so in response to Alpha's present motion to dismiss. (Emphasis in original).[89]

Mlsna recognizes that pursuant to existing case law, fraud on the patent office for purposes of establishing inequitable conduct must be proved by clear and convincing evidence. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir., 2014). However, in making an "exceptional case" determination under §285 the court must consider the "totality of the circumstances," which includes conduct not otherwise sanctionable; i.e., it does not have to form the basis of a finding of inequitable conduct. This makes sense when one considers that the purpose of imposing fees under §285 is not to punish a patentee, but "is remedial and for the purpose of compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust ... to require it to bear its own costs."[90] The Supreme Court reminds us that an additional purpose of imposing a fee award under §285 is to "advance considerations of compensation and deterrence." *Octane Fitness*, 134 S.Ct. at 1756, fn. 6.

In the instant action the court not only failed to consider the "totality of the circumstances" in denying Mlsna's request for fees, it only analyzed Dole's conduct in light of the clear and convincing burden of proof applicable to a finding

---

[89] A0005-0006

[90] *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1313 (Fed. Cir., 2014)

of inequitable conduct. This case presents a situation where it would be inequitable for Mlsna to have incurred fees and costs in defense of Alpha Tech's infringement claims even if inequitable conduct is not ultimately proved by clear and convincing evidence, since given Drake's §102(b) invalidating third party use of the claimed invention, **which was in fact known to Dole**, the '920 patent should not have issued in the first instance.

Since Mlsna need only prove that this case is exceptional and it is entitled to fees under §285 by a preponderance of the evidence and Dole had actual knowledge of the invalidating use of the claimed invention at Drake's Dairy, the court abused its discretion in not awarding Mlsna its fees and costs.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Mlsna Dairy Supply, Inc. and Phil Mlsna, Defendants-Appellants, respectfully request:

1. That the Court vacate the judgment of the district court and order that Mlsna be awarded its costs and fees in defense of this matter as an exceptional case pursuant to 35 U.S.C. §285, the amount of which to be determined on remand; or in the alternative,

2. That the Court vacate the judgment of the district court and remand for a determination, after hearing or trial, of whether Mlsna is entitled to an award of fees pursuant to 35 U.S.C. §285, and if so, the amount thereof.

Respectfully submitted this 13th day of April, 2015.


/s/ Michael T. Hopkins          .
MICHAEL T. HOPKINS
HOPKINS LAW FIRM
757 N. Broadway, Suite 201
Milwaukee, WI  53202
(866) 735-0515

Attorney for Defendants-Appellants

## ADDENDUM TABLE OF CONTENTS

Judgment, January 9, 2015 ……………………………. Addendum-001

Opinion and Order, January 8, 2015 ………………….. Addendum-002

U.S. patent 8,402,920 …………………………………. Addendum-008

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ALPHA TECHNOLOGY U.S.A.
CORPORATION d/b/a FUTURECOW,

      Plaintiff,

    v.

MLSNA DAIRY SUPPLY, INC. d/b/a
MTECH DAIRY SOLUTIONS, and
PHIL MLSNA,

      Defendants.

JUDGMENT IN A CIVIL CASE

Case No.  13-cv-870-wmc

This action came before the court for consideration with District Judge William M. Conley presiding.  The issues have been considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that judgment is entered dismissing all claims and counterclaims with prejudice and denying defendants' request for attorney's fees and costs pursuant to 35 U.S.C. § 285.

/s/

Peter Oppeneer, Clerk of Court

January 9, 2015

Date

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ALPHA TECHNOLOGY U.S.A.
CORPORATION d/b/a FUTURECOW,

                    Plaintiff,                  OPINION AND ORDER

   v.

                                                  13-cv-870-wmc

MLSNA DAIRY SUPPLY, INC. d/b/a
MTECH DAIRY SOLUTIONS, and
PHIL MLSNA,

                    Defendants.

Before the court is a motion in which *plaintiff* Alpha Technology U.S.A. Corporation seeks to dismiss its own lawsuit for lack of subject matter jurisdiction. (Dkt. #87.) In particular, Alpha contends that the case is now moot -- both as to its own claims of patent infringement and false advertisement, as well as the counterclaims of defendants' Mslna Dairy Supply, Inc. and Phil Mlsna (collectively "Mlsna") for non-infringement and invalidity -- because Alpha executed two covenants not to sue, which mirror the language in other covenants not to sue approved by the Federal Circuit and the Supreme Court. *See Already LLC v. Nike, Inc.*, 133 S. Ct. 721, 728 (2013); *Amana Refrigerator, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 854-55 (Fed. Cir. 1999). Accordingly, Alpha seeks a dismissal with prejudice as to all claims.

Happily, Mlsna agrees that Alpha's covenants not to sue are sufficiently broad to divest this court of subject matter jurisdiction over the claims brought against them, as well as their counterclaims, and request that the court dismiss all of those claims with prejudice. (Defs.' Resp. (dkt. #89) 4.) Nevertheless, Mlsna contends that the court still

has jurisdiction over their request for attorney's fees as an "exceptional case" under 35 U.S.C. § 285.   In support, Mlsna quite appropriately points to the Federal Circuit's decision in *Highway Equipment Co., Inc. v. FECO, Ltd.*, 469 F.3d 1027 (Fed. Cir. 2006), a case that essentially establishes this court's continuing jurisdiction to consider Mlsna's fee request.  In *Highway Equipment*, the plaintiff filed a covenant not to sue with the court seeking to dismiss the action it filed approximately two years earlier.  *Id.* at 1031.  The district court dismissed the plaintiff's infringement claim and the defendant's non-infringement and invalidity counterclaims, both with prejudice, but retained jurisdiction over the defendant's motion for attorney's fees pursuant to 35 U.S.C. § 285.   *Id.* Ultimately, however, the trial court opted not to award fees.

On appeal, the Federal Circuit held that "the district court correctly retained jurisdiction over [the defendant's] request for attorney's fees under 35 U.S.C. § 285."  *Id.* at 1032-33 (citing Federal Circuit precedent).   In so holding, the court specifically rejected plaintiff's argument that the court erred in entertaining defendant's request for fees because the defendant "did not receive judicial relief on the merits that alters the legal relationship of the parties."  *Id.* at 1033.  Relying on the United States Supreme Court's decision in *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 605 (2001), the Federal Circuit concluded "as a matter of patent law," that "the dismissal with prejudice, based on the covenant and granted pursuant to the district court's discretion under Rule 41(a)(2), has the necessary judicial imprimatur to constitute a judicially sanctioned change in the legal relationship of the parties, such that the district court properly could entertain [the defendant's] fee

2

claim under 35 U.S.C. § 285." *Id.* at 1035. For exactly the same reason, this court retains jurisdiction over Mlsna's request for attorney's fees and costs.

Mlsna further urges the court to consider the arguments in their summary judgment briefing to determine if this is an exceptional case. Mlsna's entire discussion of the right to fees under § 285 consists of approximately one page in their opening summary judgment brief, and largely consists of the assertion that "Alpha Technology and its President, Kevin Dole, have commenced and pursued this litigation against defendant Mlsna Dairy Supply, a direct competitor in the sale of teatscrubbing systems and chemicals, knowing that the '920 patent was procured through and by Mr. Dole's inequitable conduct." (Defs.' Opening Br. (dkt. #57) 17-18.) As detailed in other parts of their summary judgment briefing and supporting materials, defendants specifically contend that Dole failed to disclose a Puli F50 teatscrubbing system as known prior art to the United States Patent Office, and did so with deceptive intent. (*Id.* at 14-17.)

Last term, in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), the United States Supreme Court articulated the standard that must be met before a court should award attorney's fees under 35 U.S.C. § 285.

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.* at 1756.

Considering the limited evidence defendants marshal in support of their assertion that this case is "exceptional," as well as Kevin Dole's affidavit in opposition (dkt. #72), this court has little trouble concluding it does *not* "stand out" from other patent cases with respect to the strength of plaintiff's litigating position or the manner in which the plaintiff litigated its claims.   Considered in light of the totality of the circumstances, defendants' circumstantial evidence of deceptive intent -- most notably, Dole's sworn statement providing a plausible explanation for his failure to disclose the "F50 system" in particular (assuming that failure was even material) -- hardly renders defendants' case so clear-cut as to undermine the arguable merit of plaintiff's claims or its tactics in litigating this lawsuit.   On the contrary, the unrebutted fact is that Dole disclosed Puli's commercial use of the very technology embodied in the F50 system, if not that system specifically.   On the paper record, therefore, the court will deny defendant's request for attorney's fees pursuant to 35 U.S.C. § 285.

Finally, defendants contend that if its request for attorney's fees on summary judgment is not dispositive, the court should proceed to a trial on their request.   The court disagrees.   In his sworn affidavit, Doles plausibly avers that:  (1) he had forgotten the Puli F50 system was in use at Drake Dairy at the time he filed the patent application; (2) even if recalled, he did not think it was relevant in light of the different solutions used with that system; and (3) the Puli F50 system was covered in his disclosure of the Vecchia patent application and Puli's use of that technology.  (Declaration of Kevin Dole (dkt. #72) ¶¶ 28, 30.)  Defendants offer *no* evidence on summary judgment that rebuts this basic evidence as to both Dole's intent and materiality of the F50 system in

particular, much less meet the clear and convincing evidence standard of demonstrating specific intent to defraud the USPTO in light of those disclosures, nor have they done so in response to Alpha's present motion to dismiss. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) ("[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." (internal citation and quotation marks omitted)).

More importantly, plaintiff has put forth sufficient evidence at summary judgment to undermine any finding that Dole's failure to disclose the Puli F50 system in particular was material in light of his disclosure of the Vecchia Application. (*See* Declaration of Robert L. Wolter (dkt. #70) ¶¶ 9-13.) *See also Therasense*, 649 F.3d at 1295 (requiring but-for proof of materiality to demonstrate inequitable conduct). In particular, the patent application's specification not only mentions the Vecchia Application (U.S. Patent Application No. 11/490,072), but states that the system described in the Vecchia application "has been sold and distributed by Puli-System S.r.L." ('920 Patent (dkt. #1-2) 1:33-35.) In light of this undisputed evidence, the court finds no factual basis to hold a hearing before disposing of defendants' remaining request for fees.

ORDER

IT IS ORDERED that:

1) Plaintiff Alpha Technology U.S.A. Corporation's motion to dismiss for lack of subject matter jurisdiction (dkt. #87) is GRANTED;

2) Defendants Mlsna Dairy Supply, Inc. and Phil Mlsna's request for attorney's fees and costs pursuant to 35 U.S.C. § 285 is DENIED;

3) All claims and counterclaims in this action are DISMISSED WITH PREJUDICE; and

4) The clerk of court is directed to close this case.

Entered this 8th day of January, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge



US008402920B2

(12) **United States Patent**     (10) Patent No.: **US 8,402,920 B2**
Dole et al.                         (45) Date of Patent:        **Mar. 26, 2013**

(54) **SYSTEM AND METHOD FOR CLEANING TEATS OF A MILK-PRODUCING ANIMAL**

(75) Inventors: **Kevin Dole**, Longwood, FL (US);
**Stanley B. Herbin**, Oviedo, FL (US)

(73) Assignee: **Alpha Technology U.S.A. Corporation**, Longwood, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 103 days.

(21) Appl. No.: **12/883,359**

(22) Filed: **Sep. 16, 2010**

(65) **Prior Publication Data**

US 2012/0067288 A1    Mar. 22, 2012

(51) **Int. Cl.**
*A01J 7/04*            (2006.01)

(52) **U.S. Cl.** .................................... **119/14.18**; 119/664

(58) **Field of Classification Search** ............... 119/14.18, 119/652, 664, 670; 424/661
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,648,696 | A * | 3/1972 | Keith | 604/310 |
| 3,713,423 | A * | 1/1973 | Sparr, Sr. | 119/670 |
| 4,305,346 | A * | 12/1981 | Sparr, Sr. | 119/670 |
| 5,211,132 | A * | 5/1993 | Farina et al. | 119/664 |
| 5,235,937 | A * | 8/1993 | Farina et al. | 119/664 |
| 5,383,423 | A | 1/1995 | van der Lely | |
| 5,641,498 | A | 6/1997 | Loosemore | |
| 6,123,966 | A | 9/2000 | Kross | |
| 6,321,688 | B1 * | 11/2001 | Eriksson | 119/663 |
| 6,325,021 | B1 * | 12/2001 | Farina | 119/664 |
| 6,343,566 | B1 | 2/2002 | Eriksson | 119/14.01 |
| 6,394,038 | B1 * | 5/2002 | Eriksson | 119/609 |
| 6,524,624 | B1 | 2/2003 | Morelli et al. | |
| 6,550,420 | B1 * | 4/2003 | Bjork | 119/14.47 |
| 6,591,784 | B1 * | 7/2003 | Eriksson | 119/670 |

| | | | | |
|---|---|---|---|---|
| 6,752,102 | B2 * | 6/2004 | Dahl et al. | 119/14.47 |
| 7,165,510 | B2 * | 1/2007 | Hakes | 119/664 |
| 7,178,480 | B2 * | 2/2007 | Dahl et al. | 119/14.47 |
| RE41,279 | E | 4/2010 | McSherry et al. | |
| 7,882,802 | B2 * | 2/2011 | Van Den Berg et al. | 119/14.08 |
| 2007/0175405 | A1 | 8/2007 | Vecchia | |
| 2009/0084324 | A1 * | 4/2009 | Hiley | 119/652 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 399 132 | 11/1990 |
| EP | 399132 A1 * | 11/1990 |
| FR | 2559351 A1 * | 8/1985 |
| WO | WO 99/04623 | 2/1999 |
| WO | WO 99/05904 | 2/1999 |
| WO | WO 00/47041 | 8/2000 |
| WO | WO 2004/034775 | 4/2004 |

OTHER PUBLICATIONS

European Search Report, Jan. 17, 2012.
Neijenhuis, F. et al, "Relationship Between Teat-End Callosity and Occurrence of Clinical Mastitis," J. Dairy Sci., 2001, pp. 2664-2672, vol. 84, No. 12, Am. Dairy Sci. Assoc.
Dube, B. et al, "Genetic Analysis of Somatic Cell Score and Udder Type Traits in South African Holstein Cows," Sth. Afric. Journ. of Anim. Sci., 2008, pp. 1-11, vol. 38, No. 1.

* cited by examiner

*Primary Examiner* — Yvonne Abbott
(74) *Attorney, Agent, or Firm* — Robert L. Wolter, Esq.; Beusse Wolter Sanks Mora & Maire, P.A.

(57) **ABSTRACT**

An embodiment of the invention is directed to a system for cleaning teats of multiple milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started. The system comprises an aqueous chlorine dioxide disinfectant solution source provided at the parlor area; and, a hand-held applicator having a housing volume within which one or more scrubbing elements are positioned for engaging a teat of the milk-producing animal having been inserted in the volume for cleaning. The hand-held applicator is remotely operable relative to the disinfectant solution source.

**22 Claims, 8 Drawing Sheets**





*FIG. 1*



*FIG. 3*



FIG. 2

Addendum-010



*FIG. 4*



FIG. 5



FIG. 6



FIG. 7



*FIG. 8A*



*FIG. 8B*



200
Deliver Aqueous Disinfectant to Remotely Operable Applicator for Predetermined Time Duration at Predetermined Concentration
200A
Simultaneously Activate Applicator to Scrub Teats for the Predetermined Time Duration
200B
202
Discontinue Delivery of Disinfectant Solution
202A
Continue Operation of Applicator to Teat After Delivery Solution Disinfectant Solution to Dry Teats
202B

*FIG. 9*

350
300
250
200
150
100
50
0
Started Chlorine Dioxide at 75 ppm minimum
SCC (x1000)
Started Chlorine Dioxide at 150 ppm minimum
Iodine Dipping Solution
3/1/07
5/1/07
7/1/07
9/1/07
11/1/07
1/1/08
3/1/08
5/1/08
7/1/08
9/1/08
11/1/08
1/1/09
3/1/09
5/1/09
7/1/09
9/1/09
11/1/09
1/1/10
3/1/10
5/1/10
7/1/10

*FIG. 10*



*FIG. 11*

Addendum-016

US 8,402,920 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEM AND METHOD FOR CLEANING TEATS OF A MILK-PRODUCING ANIMAL

## BACKGROUND OF THE INVENTION

Embodiments of the present invention relate to systems and methods that are used for cleaning teats of milk producing animals. More specifically, the invention pertains to those systems that utilize disinfectant applicators that are remotely operable, relative to a supply of disinfectant solution, for cleaning the teats of a milk-producing animal.

A variety of different methods and systems are presently available for cleaning teats from animals that produce milk. Several methods incorporate or utilize manual labor for cleaning the teats including the immersion of the teat in a dipping cup that includes a cleaning or disinfectant solution for a period of not less than one minute. Typically such cleaning solutions are iodine-based solutions or may include 5,000 ppm of chlorine dioxide, and have a thick syrup-like consistency and/or contain conditioning additives. A worker inserts the teat in the dipping cup to immerse the teat in the disinfectant. This is done sequentially for all teats on the animal. Because the solutions are thicker or contain one or more conditioning compounds, the solutions leave a residue (sometimes a tacky residue) that must be removed from the teat before milking. Accordingly, a worker uses a towel to dry each teat in preparation for milking. Such methods that incorporate these manual steps may be impractical for larger dairies, which may include thousands of cows. In addition, such method may be slower than systems that may include remotely operable solution applicators.

Systems are available that utilize rotating brushes in combination with a cleaning solution to clean teats. One such system is disclosed in U.S. patent application Ser. No. 11/490,072 which has been sold and distributed by Puli-Sistem S.r.l. Such systems may include applicators having three rotating brushes, two of which rotate to scrub/clean a base of the teat, and a third brush which is arranged to scrub/clean a tip of the teat. The applicators are in fluid communication with a disinfectant source, which is supplied to the applicators as the brushes are rotating and scrubbing the teats. The applicators are remotely operated relative to the solution source.

However, such systems do not account for different teat lengths. As a departure from breeders of dairy cattle in foreign countries, American breeders and bull studs have concluded that shorter teats present many advantages to the traditional long-teated cow. Shorter teats are more functional for American dairies and milking practices, are less apt to be stepped on or injured and are less inclined to develop infections (mastitis). From multiple sources including scientific journals and compendia of data listing typical traits of dairy cows, it has been discovered that the teats of American dairy cows have incrementally shortened to an average length of 1.8"-1.9". At current cow teat lengths, prior art, including the above-reference Puli-Sistem cleaning system, contains a teat end brush that is too far away from the teat to adequately clean most cows' teats of American bred cows.

In addition, the brushes typically include bristles that are polypropylene filament bristles and are rotated at 1,000 rpm. The polypropylene bristles are rotated at such high speed cause discomfort to the animal during cleaning, which may adversely affect milk production. Current systems also fail to adequately seal moving parts from debris such as dirt, sand, etc., that is removed from the teats. Lubricants are used on the gears and the interface between the gears and brushes. The debris combined with the lubricant form an abrasive amalgam that prematurely degrades the components of the applicator.

In addition, the excessive speed causes premature wear on components such as gears, bushings and the like.

Other problems associated with rotating brush systems include the disinfectant solutions, which often do not account for varying water qualities at different farm locations. Prior art systems that utilized an aqueous chlorine dioxide disinfectant solution, delivered the $ClO_2$ disinfectant in a concentration of about 75 ppm. While this concentration may be effective for cleaning, impurities in water sources can react with the $ClO_2$ dissipating the concentration of this active ingredient and the effectiveness of the solution. Moreover, these solutions contained conditioning additives that suffered from the above-described problems.

In addition, current solution delivery systems often do not provide a consistent concentration of the active chemical of the disinfectant solution to the rotating brushes. More specifically, the active chemical is supplied to the brushes in pulses interspersed with pulses of water without solution. Because each teat is an independent cleaning and disinfecting event, the lack of disinfectant on any one teat is considered an inadequate cleaning. Accordingly, a need exists for providing a system or method for cleaning animal teats that supplies disinfectant solutions to an applicator in a consistent concentration and in a manner that does not create discomfort prior to milking operations; and, the concentration of the active chemical of the solution is provided at such a concentration to account for varying water qualities at different milking facilities. Also, such a system preferably may account for the different teat lengths of animals.

## BRIEF DESCRIPTION OF THE INVENTION

An embodiment of the invention is directed to a system for cleaning teats of milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started. The system comprises an aqueous chlorine dioxide disinfectant solution source provided at the parlor area; and, a hand-held applicator having a housing volume within which one or more scrubbing elements are positioned for engaging a teat of the milk-producing animal having been inserted in the volume for cleaning. The hand-held applicator is remotely operable relative to the disinfectant solution source.

A delivery station is provided in fluid communication with the hand-held applicator and the disinfectant solution source, for delivering the disinfectant solution to the housing volume of the hand-held applicator with a predetermined concentration of chlorine dioxide. In addition, a controller is provided in electrical communication with the hand-held applicator and the delivery station. The controller is configured to initiate the actuation of the scrubbing elements and delivery of the disinfectant solution to the hand-held applicator as the scrubbing elements are actuated, wherein the disinfectant solution is delivered to the hand-held applicator with the predetermined concentration. The disinfectant preferably has a viscosity and vapor pressure that is substantially equal to that of water and does not include any compounds or materials such as conditioners, humectants, moisturizes, etc., that may increase the viscosity or lower the vapor pressure of the solution. Accordingly, the teat may be partially dried after a cleaning operation so that some residual amount of the disinfectant solution remains on a teat allowing the teat to dry by sublimation of the cleaning solution. This allows the disinfectant to remain in contact with the teat for a more effective sanitation of the teat.

In a preferred embodiment, the disinfectant solution is delivered to the application with a concentration of chlorine

US 8,402,920 B2

3                                                                      4

dioxide being about 100 ppm to about 200 ppm by volume. The predetermined concentration of the chlorine dioxide delivered to the hand-held applicator is preferably 150 ppm.

In a preferred embodiment, the scrubbing elements include at least two scrubbing elements including a first brush positioned in the housing for engaging an end of the teat through which milk is released, and a second brush that is positioned in the housing to engage an area of the teat above the end of the teat. The first and second brushes comprise an array of nylon fibers and the brushes are rotated at a speed between about 400 rpm to about 700 rpm, and preferably about 500 rpm. In a preferred embodiment, the first brush includes an array of bristles including a first set of bristles having a first length and a second set of bristles that have a second length that is longer than the first length to engage the ends of teats of different lengths.

The invention also includes a method for cleaning teats of multiple milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before the milking operation is started. The method comprises providing a source of an aqueous chlorine dioxide disinfectant solution at a location within or at the parlor. The method also includes delivering, for a first predetermined time duration, the aqueous chlorine dioxide disinfectant solution containing a predetermined concentration of preferably about 150 ppm of chlorine dioxide by volume to a housing of a hand-held applicator that has a teat inserted within a volume of the housing. As described above the applicator has movable scrubbing elements in the housing element. The method further comprises simultaneously actuating the scrubbing elements for cleaning the teats in the presence of the solution for the predetermined time duration, wherein the applicator is remotely operable relative to the solution source. The method may also comprise actuating the scrubbing elements for a second time duration, while solution is not delivered to the applicator in order to dry the teats. In a preferred embodiment, the teats are only partially dried so that residual disinfectant solution may remain on the teats. Because the solution does not contain the above-mentioned conditioners, humectants, moisturizers etc., the residual solution will adequately sublime or evaporate from the teats prior to attachment of a milking machine, thereby allowing some residual disinfectant to remain in contact with the teat for longer periods to time compared to the prior art solutions.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram of the system for cleaning teats.

FIG. 2 is a schematic illustration of the dilution station with logic board, applicator and motor for driving an applicator.

FIG. 3 is sectional view of a static mixer incorporated in the dilution station.

FIG. 4 is a perspective view of a hand-held applicator.

FIG. 5 is an exploded perspective view of the applicator of FIG. 4.

FIG. 6 is a sectional view of a brush and gear housing showing the brush/bearing interface and the brush/seal/gear interface.

FIG. 7 is an end view of a teat end brush having filament bristles of multiple lengths.

FIG. 8A is a schematic illustration of brushes in applicator including teat end brush for cleaning a shorter length teat.

FIG. 8B is a schematic illustration of brushes in applicator including teat end brush for cleaning a longer length teat.

FIG. 9 is a flow chart including steps in a method or process for cleaning the teats of a milk-producing animal.

FIG. 10 is a graph showing somatic cell counts using a disinfectant solution comprising a 150 ppm chlorine dioxide solution compared to prior art solutions.

FIG. 11 is a bar graph comparing brushes with nylon bristles rotated at about 500 rpm compared to a dip cleaning operation and a cleaning operation with brushes having polypropylene bristles rotated at about 1,000 rpm.

DETAILED DESCRIPTION OF THE INVENTION

A more particular description of the invention briefly described above will be rendered by reference to specific embodiments thereof that are illustrated in the appended drawings. Understanding that these drawings depict only typical embodiments of the invention and are not therefore to be considered to be limiting of its scope, the invention will be described and explained.

With respect to FIG. 1, there is shown schematically a system 10 for cleaning teats of a milk-producing animal. As shown, the system 10 is configured to deliver an aqueous disinfectant solution to one or more solution applicators 26 positioned in a milking parlor 24 and to the teats of a milk producing animal. The system 10 generally includes a chemical mixing/diluting station 12 at which a concentrated disinfectant is generated by mixing a starter chemical solution with an activator. As disinfectant source is provided including a container 16 of sodium chlorite and a container 18 of the acid activator for generating the concentrated disinfectant, which is diluted as station 12 for delivery to the milking parlor 24. Accordingly, FIG. 1 references a delivery section 14 that includes the solution applicator 26 and may also include components of the mixing/diluting station 12.

While an embodiment illustrates and describes applicators that include a housing attached to a handle, and rotating brushes within the housing to clean teats in the presence of a disinfectant solution, the invention is not limited to the use of rotating brushes. The invention may cover applicators 26 that include other applicator mechanisms that operate remotely relative to a source of disinfectant delivered to the applicator mechanism, which contacts teats and move relative to the teats to scrub and clean the teats in the presence of the disinfectant solution.

The Disinfectant Solution

The disinfectant solution that is applied to the teats is preferably an aqueous chlorine dioxide solution with the concentration of the chlorine dioxide being in the range of about 50 ppm to about 200 ppm. In a preferred embodiment, the concentration of chlorine dioxide is about 125 ppm to about 175 ppm, and preferably about 150 ppm. In addition, the solution does not contain additives such as conditioners, humectants, moisturizers, etc. that may thicken the solution, or increase the viscosity or decrease the vapor pressure of the solution. Accordingly, the solution has a viscosity and/or vapor pressure that is substantially equal to that of water. The estimated vapor pressure of 200 ppm acidified chlorine dioxide solution with a pH 3.00 at 25° C. is about 23.8 mmHg±1 mmHg. The estimated viscosity of the same solution at 20° C. is about 1.002 mPa±0.001 mPa. After cleaning a teat with this solution, the teat may be partially dried so that some residual disinfectant remains on the teat for sublimation or evaporation. This allows the disinfectant to remain in contact with the teat for longer periods of time as compared to prior art solutions. As explained in more detail below, the applicators 26 having rotating brushes mounted within a brush housing that scrub teats while the aqueous disinfectant solution is delivered within a volume of the brush housing and applied to the teats.

US 8,402,920 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

The graph shown in FIG. 10 illustrates somatic cell count test results of the experimental use of the above-described disinfectant with a concentration of approximately 150 ppm of chlorine dioxide used with the below-described teat scrubbing unit having rotating brushes with nylon bristles, and the brushes were rotated at about 500 rpm. Somatic cell count is an indicator of the quality of milk produced. The number of somatic cells increases in response to pathogenic bacteria that may cause mastitis. Somatic cell count is quantified per milliliter.

The somatic cell count results for the disinfectant solution having a concentration of 150 ppm of chlorine dioxide are provided in comparison to a disinfectant solution having a concentration of about 75 ppm of chlorine dioxide. The less concentrated solution also contained one or more additives such as a moisturizer. In addition, the 75 ppm solution was used with a prior art scrubbing unit that had rotating brushes with polypropylene filament bristles being rotated at about 1,000 rpm.

Data is also provided relative to somatic cell count using an iodine dipping solution for cleaning teats and wiping the teats dry with a towel. The somatic cell counts were taken at the same dairy at the beginning of every other month, which was and is the normal procedure for the dairy at which the experimental use of the inventive solution was used. As shown in the graph, the less concentrated solution of 75 ppm of chlorine dioxide produced somatic cell counts of about 200,000/ml to about 275,000/ml over about a two year period. When the experimentation of the inventive solution having 150 ppm of chlorine dioxide began, somatic cell count dropped below 150,000/ml thereby indicating the inventive disinfectant solution has a direct effect on pathogens that may cause mastitis.

System for Applying Solution

The aqueous chlorine dioxide disinfectant solution is generated by combining chlorite (ClO2⁻), in the form of a metal salt such as sodium chlorite, with an acidic activator. Accordingly in reference to FIG. 1, a disinfectant source 15 is provided and includes in a container 16 of sodium chlorite and a container 18 of the acid activator. In an embodiment of the invention, the acid activator in tank 18 is citric acid and preferably is a 50% citric acid solution that is combined with a 2% to 5% aqueous sodium chlorite solution in container 16, and preferably a 3% to 4% sodium chlorite solution, which contains about 32,000 ppm of sodium chlorite.

The tanks 16 and 18 are in fluid communication, via lines 30 and 32 respectively, with a chemical activation system 20. In addition, a water line 36 feeds water from a water source (not shown) to mix the sodium chlorite and acid activator (citric acid) with water. The activation system 20 referred herein operates generally on a venturi principal with the water flow from water line 36 generating suction to draw the sodium chlorite and the acid activator into the activation system 20 in mixing relationship with water. The sodium chlorite is mixed with the acid activator and water to generate an aqueous chlorine dioxide solution preferably having a concentration of about 6,400 ppm chlorine dioxide, which is further diluted at the diluting station 22, explained below in more detail.

An example of such an activation system is the Automated Activation Non-Electric (AANE) system that can be purchased from Bio-Cide International, Inc. located in Norman, Okla. The activation system 20 may operate using a float mechanism to control the volume of solution mixed. More specifically, when the volume of solution mixed in the activation system 20 drops to a predetermined level or volume, a valve control to the water line 36 is opened to initiate water flow so that sodium chlorite and acid activator is drawn into the activation system 20. Once the mixed solution reaches a

predetermined volume, the float mechanism closes the appropriate water flow control valve.

The activation system 20 and dilution station 22 are in fluid communication via line 28 for delivery of the aqueous chlorine dioxide to the dilution station 22. As shown schematically in FIG. 2, the dilution station 22 includes a pump 42 that pumps the aqueous chlorine dioxide solution from the activation system 20 to the dilution station 22. In addition, water is directed to the dilution station 22 via water line 34 and mixed with the chlorine dioxide from the activation system 20. More specifically, the aqueous solution of chlorine dioxide and water are passed through a static mixer 28 to dilute the aqueous solution of chlorine dioxide to a predetermined concentration and produce a consistent flow of cleaning solution to the applicator applicators 26 in the milking parlor 24. The disinfectant solution is delivered to the applicator 26 via line 40.

As shown in FIG. 3, the static mixer 28 includes a mixer element 48 that has a generally helical configuration and is positioned within a housing 50. While reference is made to the helical configuration other designs known to those skilled in the art may be used. The mixing element 48 may be composed of a chemically inert material, such as stainless steel or polypropylene, relative to the chemicals used to make the disinfectant. Mixing elements and/or static mixers can be purchased from Sulzer Ltd., which is headquartered in Switzerland. The housing 50 includes a water inlet port 52 and solution inlet port 54 disposed at a first end 50A of the housing. An outlet port 56 is disposed at the opposite or second end 50B of the housing 50 for the diluted aqueous chlorine dioxide, or disinfectant to exit the static mixer 28.

The helical configuration of the mixer element 48 allows for adequate mixing of the concentrated chlorine dioxide with water to provide a consistent flow of disinfectant to an applicator 26 in the parlor 24. Prior art systems not using a static mixer often suffer from disinfectant solution being provided to an applicator in pulses such that disinfectant was or is not consistently applied to teats, resulting in no disinfectant applied to some teats during a cleaning/disinfecting operation. The incorporation of the static mixer 28 solves these problems.

An example of a pump that may be used to introduce the concentrated disinfectant into the static mixer 28 is a six cubic centimeter diaphragm pump that may pump about 0.6 ml per pulse. In addition, water via line 34 may be introduced at about 40 psi, which is about 1,450 ml/minute. The activation of the pump 42 and the flow of water via line 34 is generally controlled by a switch 132 on the applicator 26, and schematically shown in FIG. 2. More specifically, the applicator 26 includes a switch 132 that is electrically connected to the pump 42. In addition, and as shown in FIG. 2, a solenoid valve 32 may be positioned between the water line 34 and static mixer 28 that is opened when the switch 132 is actuated. When an operator of the system 10 actuates the switch 132 on the applicator 26, the pump 42 delivers the concentrated chlorine dioxide to the static mixer 28 at the dilution station 22. In addition, the solenoid valve 32 is opened so that water is also delivered to the static mixer 28 to mix the water with the concentrated chlorine dioxide.

A fluid flow regulator 46 is preferably disposed between the solenoid valve 32 and the static mixer 28 to control a water flow rate into the static mixer 28 so that the chlorine dioxide solution is diluted to a predetermined concentration described above for delivery to the applicator applicators 26. For example, water may be introduced via line 34 at 40 psi, which is approximately 1.45 liters/minute.

US 8,402,920 B2

7

Again in reference to FIG. 2, the dilution station 22 may include one or more check valves to control flow of the disinfectant solution. As shown, a first check valve 58 may be disposed between the solenoid valve 32 and the static mixer 28 to prevent backflow of the disinfectant into the water line 34. In addition, a second check valve 60 may be disposed between the outlet port 54 of the static mixer 28 and the applicator 26, and preferably adjacent to the static mixer 28, to prevent the flow of the disinfectant solution to the applicator 26 when the system 10 is not in use. Accordingly, the check valve 60 may be set to open only when the fluid pressure in the line 40A exceeds a predetermined pressure which is indicative of the disinfectant solution being delivered to the applicator 26 while in use.

Hand-Held Applicator

A disinfectant solution applicator 26 that may be used in embodiments of the invention is schematically shown in FIGS. 2, 4 and 5. One or more applicators 26 are positioned within the milking parlor 24 to clean and disinfect teats of a plurality of milk-producing animals such as cows that have been herded into the parlor 24 for milking. The applicator 26 includes a plurality of rotating brushes 86 that are operatively connected with a gear system including a plurality of gears 88 that are actuated by a drive shaft 90, which in turn is driven by a motor 138.

In an embodiment, at least one applicator 26 is provided in fluid and electrical communication with the above-described dilution station 22 from which the aqueous disinfectant is delivered. The applicator 26 is remotely positioned and operable relative to the dilution station 22, power source (not shown) and logic control board 130, so that an operator may hold and use the applicator 26 at various locations throughout the parlor 24. Accordingly, the system 10 and applicator 26 can be used with milking parlors of varying designs such as parallel, herringbone and rotating parlors.

Again with respect to FIG. 2, the applicator 26 is connected in fluid communication to the dilution station 22 by a flexible conduit/line 40 and in electrical communication by electrical lines 96 contained within a flexible and insulated jacket 98. The conduit/line 40 is preferably composed of neoprene or santoprene, having an inside diameter of about 0.17 inches. As shown in FIG. 2, the electrical lines 96 are connected to a logic board 130 that is programmed to control the activation of pump 42 and solenoid valve 32 for diluting the concentrated disinfectant at the diluting station 22 and delivery of the diluted disinfectant to the applicator 26. In addition, the logic board 130 is programmed to command the rotation of the brushes 86 coincident with delivery of the diluted disinfectant to the applicator.

In a preferred embodiment, the logic board 130 is programmed such that when the switch 132 is depressed or actuated the disinfectant is delivered from the dilution station 22 to a volume within applicator 26 occupied by the brushes 86. As long as the switch 132 is actuated, the disinfectant is delivered to the applicator 26 and the brushes 86, which are rotating. The logic board 130 is preferably programmed so that when the switch 132 is released, the solenoid valve 32 is closed and pump 42 is deactivated. However, the logic board 130 may be programmed with a delay so that brushes 86 continue to rotate for a predetermined time duration after the delivery of the disinfectant has been discontinued. In an embodiment, the time delay may be about 4 to about 7 seconds so that the rotating brushes 86 may be used to partially dry teats after the application of the disinfectant.

With respect to FIGS. 4 and 5, the components of the applicator 26 are illustrated in more detail. As shown, the applicator 26 includes a handle 80, a gear housing 82 and a

8

brush housing 84. A shell casing 100 is configured at one end to form the handle 80 that houses the insulated jacket 98 with the flexible conduit/line 40 and electric lines 96, and a flexible drive shaft 90. As shown schematically in FIG. 2, the jacket 98 encasing the conduit 40 and electrical lines 96 are connected to an adapter 134 that is mounted to a housing 136 for a motor 138 that actuates the flexible drive shaft 90. The motor 138 may be a 24 volt DC brushless asynchronous motor that is in electrical communication with the logic board 130 via one of the electrical lines 96. The motor 138 is preferably driven at about 900 rpm so the brushes 86 rotated at preferably 500 rpm.

The flexible conduit 40, remaining electrical lines 96 and the drive shaft 90 extend through a flexible jacket 98 to the applicator 26. More specifically, these components are also housed in the handle 80 of the applicator 26, with the drive shaft terminating at the below-referenced gear housing 82 and the electrical lines 96 connected switch 132 and ground.

The shell casing 100 also forms in part the gear housing 82, which houses the gears 88 beginning at a point where the drive shaft 90 terminates. The drive shaft 90 extends through a first mounting plate 104 and is operatively connected to a central gear 88D, and is secured to the first mounting plate 104 with an adaptor 108. A second mounting plate 106 is secured in space relation to the first plate 104, wherein the shell casing 100, first mounting plate 104 and second mounting plate 106 define the gear housing 82.

In a preferred embodiment, the applicator 26 includes three brushes 86A, 86B and 86C wherein each such brush is operatively connected to a corresponding gear 88A, 88B and 88C. In addition, a central gear 88D is operatively connected to the drive shaft 90 as described above and each of the gears 88A, 88B and 88C to rotate the brushes 86A, 86B and 86C. A cover 110 is mounted to the second plate 106 forming the brush housing 84. The cover 110 includes a first opening 112 through which a teat of an animal is inserted for cleaning, and a second opening 114 that allows debris and fluid to escape from the brush housing 84 during a cleaning operation.

With respect to FIG. 6 the interface of the gears 88 with the brushes 86 is represented by reference to a single brush 86 and gear 88, the second plate 106 includes hubs 116 through which a base 118 of a brush 86 is inserted for engagement with a corresponding gear 88. A bushing 120 is disposed within each hub 116 and includes a lip 122. In addition, the base 118 of each brush 86 includes a step 124 that fits in mating relationship with lip 122 on bushing 120. In this manner, the gear housing 82 and brush housing 84 are sealed from one another so that debris cleaned from teat is purged from the brush housing 84 and does not enter the gear housing 82 thereby fouling the components, namely the gears 88, in the gear housing 82 and bushing 120.

The gears 88A-88D and the bushings 120 are preferably composed of Hydex® 4101L, which is a polybutylene terephthalate plastic that has a relatively low coefficient of friction, and does not require lubricating materials. Prior art teat scrubbers typically use components that required lubricating materials. If debris enters the gear housing, the lubricating material captured the debris forming an abrasive amalgam that fouls the gear components.

With respect to FIG. 8A the arrangement of the brushes 86A, 86B and 86C are shown in more detail. As illustrated, a preferred embodiment includes two base brushes 86A and 86B that positioned side-by-side and adjacent to the first opening 112 of the cover 110. The brush 86C may also be referred to as a tip brush that is positioned relative to the other base brushes 86A and 86B, and relative to a teat of an animal to clean the tip of the teat. In an embodiment, the bristles on

US 8,402,920 B2

9 10

the brushes **86** are preferably nylon filaments having a diameter of 0.12 mm. The brushes **86** are preferably rotated at rotational speeds of about 400 rpm to about 700 rpm, and ideally rotated at a speed of about 500 rpm. Prior art applicators that include brushes utilize polypropylene filaments having diameter of 0.10 mm which provide a more coarse touch to a teat than brushes composed of nylon filaments. In addition, the prior art systems having polypropylene filament bristles are rotated at speeds of about 900 to about 1,000 rpm, which may adversely affect animal comfort during cleaning, which can affect the amount of milk produced during milking.

With respect to FIG. **11** a bar graph illustrates the percentage of milk produced during the first two minutes of a milking using an iodine dipping solution and towel wiping for drying, a teat scrubbing unit with brushes rotating at 1,000 rpm and a teat scrubbing unit using brushes rotated at 500 rpm. The brushes rotated at 1,000 rpm were the prior art brushes including the polypropylene filament bristles. The brushes rotated at 500 rpm included the above-described nylon filament bristles. A disinfectant solution with a concentration of about 150 ppm aqueous chlorine dioxide (with moisturizing additives) and a 75 ppm aqueous chlorine solution (without additives) was used with the scrubbing unit having brushes rotated at 1,000 rpm. A 75 ppm aqueous chlorine dioxide solution (without additives) was used with the scrubbing unit having brushes rotated at 1,000 rpm. The data was taken from six different dairies each using the three different teat-cleaning techniques.

As shown, the brushes having the nylon filament bristles rotated at about 500 rpm produced more milk during the first two minutes of a milking operation. More specifically, the system produced on average about 63.33% of the total milk produced in a milking operation during the first two minutes of THE milking operation. An average of 51.33% of the total milk produced during a milking operation was produced during the first two minutes of a milking operation using the polypropylene filament brushes rotated about 1,000 rpm. An average of 44.67% of the total milk produced during a milking operation was produced during the first two minutes of a milking operation using the iodine dip and wiping the teats dry.

Average milking operations are about 4½ to 6 minutes with all teats being milked simultaneously; and, some dairies may have milking operation of less than 4 minutes. By producing more milk during the first two minutes of a milking operation, the total time of the milking operation can be reduced. In addition, cows that produce more milk during that first two minutes of a milking operation are more likely to "milk-out" completely, which is known to reduce the chances of mastitis. Moreover, more milk produced in the first two minutes of a milking operation is an indicator that the cleaning process is providing good quality stimulation to the teats.

In an embodiment, all of the brushes **86**A, **86**B and **86**C have the same diameter. For example, the brushes **86**A, **86**B and **86**C may have a diameter measured from an end of a bristle to the end of a diametrically opposed bristle of about 1.625 inches for cleaning the teats of a cow; however, the brush diameter may vary according to the size of diameter and/length of the teat **126** inserted for cleaning and positioning of the brushes relative to one another.

In reference to FIGS. **7**, **8**A and **8**B, there is schematically illustrated another embodiment of the invention with the teat end brush **86**C including bristles having multiple lengths, and the positioning of the teat end brush **86**C relative to the barrel brushes **86**A and **86**B and a teat **124**. Providing bristles of multiple lengths, the system **10** and the applicator may

account for teats of varying lengths. By way of example, American bred cows have a teat length that is about 1.8 inches to about 1.9 inches, while teats of foreign bred cows may be longer.

In reference to FIG. **7**, the teat end brush **86**C includes bristles **140** for cleaning a teat, wherein the bristles **140** include a first of set of bristles **140**A and a second set of bristles **140**B. The first set of bristles **140**A has a length that is shorter than the length of the second set of bristles **140**B. As shown in FIG. **8**A, a teat **124** is inserted into the brush housing **84** of the applicator **26** and between the barrel brushed **86**A and **86**B. The rotating barrel brushes **86**A and **86**B contact the teat base **126** and the teat end brush **86**C engage the teat tip **128**. More specifically, FIG. **8**A shows the second set of (longer) bristles **140**B engaging the tip **128** of a teat **124** having a shorter length; and in FIG. **8**B, from surface **110**A to a free end of the bristles **140**B may be about 2.2 inches for longer teat lengths. While bristles **140**A and **140**B are shown brushing against the teat **124**, the distances D1 and D2 shown in FIGS. **8**A and **8**B respectively, are determined from the surface **110**A to a free end of the bristles **140** when the bristles **140** are in a static position and not operational.

Method of Applying Disinfectant Solution

Steps in application of a disinfectant solution are set forth in flowchart shown in FIG. **9**. In step **200**, two operations take place including step **200**A in which delivery of the aqueous disinfectant solution to the applicator takes place for a predetermined time duration. In step **200**B the applicator is simultaneously activated to scrub the teats for the predetermined time duration while the disinfectant solution is delivered. As described above, the actuation of the switch **132** initiates command or electrical signals that result in the solenoid valve **32** opening and activation of pump **42**, so water (via line **34**) and concentrated disinfectant solution (via line **28** from activation system **20**) respectively flows through mixer **28** and to the applicator **26**.

Actuation of the switch **132** also transmits signals causing the brushes **86** to rotate so a teat **124** is scrubbed as the disinfectant solution is delivered to the brush housing **84**. Milk producing animals, such as cows, have four teats. The cleaning operation preferably takes place from the rear or side of the cow, and begins with the teat are furthest away and moves in a clockwise or counter-clockwise direction. The solution is delivered to the rotating brushes **86** as long as the switch **132** is actuated. The solution may be delivered for a first time duration of about 5 to 8 seconds when the brushes are rotating. The applicator **26** is preferably reciprocated in an up-down and twisting motion during application of the solution to adequately clean the teat.

As previously indicated the solution is an aqueous chlorine dioxide solution having a concentration of about 150 ppm and delivered to the brushes **86** at a flow rate of about 40 psi, or about 1.45 L/min. The brushes **86** are preferably composed of nylon bristles and rotate at a speed of about 500 rpm to about 520 rpm.

US 8,402,920 B2

11

12

After all teats have been scrubbed and are free of visible soil, the switch 132 is released which discontinues or stops the delivery of the disinfectant solution to the applicator 26, which is set forth in step 202A. However, the logic control 130 is programmed with a time delay so the brushes 86 continue to rotate for a second predetermined time duration as the brushes 86 remain in contact with the teat, as described in step 202B. The brushes 86 may continue to rotate for a sufficient time, i.e. 4 to 7 seconds to dry the teats. This second time duration is preferably of a length so that the teat is not entirely dried of the solution and some solution residue may remain on the teat to further disinfect the teat. After a teat has been cleaned and dried the applicator 26 is moved to the next teat. By beginning with teats that are positioned farthest away and moving in a clockwise or counterclockwise direction, cross contamination may be avoided. The disinfectant solution is then in contact with skin on the teat for 60 to 120 seconds, because the solution does not contain any conditioning compounds the solution sublimes prior to attachment of a milking machine.

While certain embodiments of the present invention have been shown and described herein, such embodiments are provided by way of example only. Numerous variations, changes and substitutions will occur to those of skill in the art without departing from the invention herein. Accordingly, it is intended that the invention be limited only by the spirit and scope of the appended claims.

What is claimed is:

1. A system for cleaning teats of milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started, the system comprising:

a disinfectant solution source provided at the parlor area;

a hand-held applicator having a housing volume within which one or more scrubbing elements are positioned for engaging a teat of the milk-producing animal having been inserted in the volume for cleaning;

a delivery station, comprising at least a pump and a conduit in fluid communication with the hand-held applicator and the disinfectant solution source, for delivering the disinfectant solution to the housing volume of the hand-held applicator with a predetermined concentration of chlorine dioxide;

a motor operatively connected to the scrubbing elements to actuate the scrubbing elements;

a controller, in electrical communication with the hand-held applicator, the motor and the delivery station, that is configured to initiate the actuation of the scrubbing elements and delivery of the disinfectant solution to the hand-held applicator as the scrubbing elements are actuated; and,

wherein the hand-held applicator is remotely operable relative to the disinfectant solution source, and the disinfectant solution is delivered to the hand-held applicator and applied to the teats in a non-foaming aqueous form having a viscosity and/or vapor pressure that is substantially equal to that of water.

2. The system of claim 1 wherein the disinfectant solution delivered to the hand-held applicator contains about 100 ppm to 200 ppm by volume of chlorine dioxide.

3. The system of claim 2 wherein the disinfectant solution delivered to the hand-held applicator contains about 150 ppm by volume of chlorine dioxide.

4. The system of claim 1 wherein the scrubbing elements include a rotatable brush disposed in the housing for engaging an end of the teat through which milk is released, and the brush includes an array of bristles including a first set of bristles having a first length and a second set of bristles that have a second length that is longer than the first length.

5. The system of claim 4 wherein scrubbing elements comprise a plurality of rotatable brushes including the first brush and at least one second brush that engages an area of the teat above the teat end for teat of the milk-producing animal having been inserted in the housing volume for cleaning, and each of the brushes includes nylon bristles and the brushes are rotated at a rotational speed from about 400 rpm to about 700 rpm.

6. A system for cleaning teats of milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started, the system comprising:

an aqueous chlorine dioxide disinfectant solution source provided at the parlor area, wherein the disinfectant solution has a viscosity and/or vapor pressure substantially equal to water;

a hand-held applicator having a housing volume within which one or more scrubbing elements are positioned for engaging a teat of the milk-producing animal having been inserted in the volume for cleaning;

a delivery station in fluid communication with the hand-held applicator and the disinfectant solution source, for delivering the disinfectant solution to the housing volume of the hand-held applicator with a predetermined concentration of chlorine dioxide;

a controller, in electrical communication with the hand-held applicator and the delivery station, that is configured to initiate the actuation of the scrubbing elements and delivery of the disinfectant solution to the hand-held applicator as the scrubbing elements are actuated; and,

wherein the hand-held applicator is remotely operable relative to the disinfectant solution source; and,

wherein the one or more scrubbing elements includes at least two rotatable brushes disposed with the housing of the hand-held applicator wherein a first brush is positioned in the housing for engaging an end of the teat through which milk is released, and a second brush is positioned in the housing to engage an area of the teat above the end of the teat, and the first and second brushes comprise an array of nylon fibers and the brushes are rotated at a rotational speed from between about 400 rpm to about 700 rpm.

7. The system of claim 6 wherein the brushes are rotated at a rotational speed of about 500 rpm to about 550 rpm.

8. A system for cleaning teats of milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started, the system comprising:

an aqueous chlorine dioxide disinfectant solution source provided at the parlor area, wherein the disinfectant solution, when applied to the teats of an animal, has a viscosity and/or vapor pressure substantially equal to water;

a hand-held applicator having a housing volume within which one or more scrubbing elements are positioned for engaging a teat of the milk-producing animal having been inserted in the volume for cleaning;

a delivery station in fluid communication with the hand-held applicator and the disinfectant solution source, for delivering the disinfectant solution to the housing volume of the hand-held applicator with a predetermined concentration of chlorine dioxide;

a controller, in electrical communication with the hand-held applicator and the delivery station, that is configured to initiate the actuation of the scrubbing elements

US 8,402,920 B2

13

and delivery of the disinfectant solution to the hand-held applicator as the scrubbing elements are actuated; and, wherein the hand-held applicator is remotely operable relative to the disinfectant solution source; and,

wherein the scrubbing elements include a rotatable brush disposed in the housing for engaging an end of the teat through which milk is released, and the brush includes an array of bristles including a first set of bristles having a first length and a second set of bristles that have a second length that is longer than the first length.

9. A system for cleaning teats of milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started, the system comprising:

an aqueous chlorine dioxide disinfectant solution source provided at the parlor area, wherein the disinfectant solution, when applied to the teats of an animal, has a viscosity and/or vapor pressure substantially equal to water;

a hand-held applicator having a housing volume within which one or more scrubbing elements are positioned for engaging a teat of the milk-producing animal having been inserted in the volume for cleaning;

a delivery station in fluid communication with the hand-held applicator and the disinfectant solution source, for delivering the disinfectant solution to the housing volume of the hand-held applicator with a predetermined concentration of chlorine dioxide;

a controller, in electrical communication with the hand-held applicator and the delivery station, that is configured to initiate the actuation of the scrubbing elements and delivery of the disinfectant solution to the hand-held applicator as the scrubbing elements are actuated; and, wherein the hand-held applicator is remotely operable relative to the disinfectant solution source; and,

wherein the scrubbing elements include a rotatable brush disposed in the housing for engaging an end of the teat through which milk is released, and the brush includes an array of bristles including a first set of bristles wherein each bristle has a free end that is positioned in the housing a first distance from an outside surface of the housing adjacent to an opening through which the teat is inserted and a second set of bristles wherein each bristle has a free end that is positioned in the housing a second distance from the outside surface of the housing and the first distance is greater than the second distance.

10. A system for cleaning teats of milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started, the system comprising:

an aqueous chlorine dioxide disinfectant solution source provided at the parlor area, wherein the disinfectant solution, when applied to the teats of an animal, has a viscosity and/or vapor pressure substantially equal to water;

a hand-held applicator having a housing volume within which one or more scrubbing elements are positioned for engaging a teat of the milk-producing animal having been inserted in the volume for cleaning;

a delivery station in fluid communication with the hand-held applicator and the disinfectant solution source, for delivering the disinfectant solution to the housing volume of the hand-held applicator with a predetermined concentration of chlorine dioxide;

a controller, in electrical communication with the hand-held applicator and the delivery station, that is configured to initiate the actuation of the scrubbing elements

14

and delivery of the disinfectant solution to the hand-held applicator as the scrubbing elements are actuated; and, wherein the hand-held applicator is remotely operable relative to the disinfectant solution source; and,

the disinfectant solution source comprising an aqueous concentrated chlorite salt solution and a citric acid solution, wherein the chlorite salt solution contains about 32,000 ppm by volume of a chlorite salt, and the citric acid solution has a 50% molar concentration of citric acid in water, and the system further comprises:

an activation system, in fluid communication with the hand-held applicator, that mixes the citric acid with the chlorite salt solution at a predetermined ratio to form a concentrated chlorine dioxide solution having a concentration of about 3,200 ppm to about 9,600 ppm of chlorine dioxide;

the delivery station including a dilution station, in fluid communication between the hand-held applicator and the activation system and in electrical communication with the controller, whereupon command from the controller the concentrated chlorine dioxide solution is diluted to a predetermined concentration of chlorine dioxide delivered to the hand-held applicator.

11. The system of claim 10 wherein the dilution station comprises:

a static mixer in fluid communication with a water source, the activation system and the hand-held applicator;

a pump disposed between the static mixer and the activation system, and the pump is in electrical communication with the controller, whereupon command from the controller, pumps the concentrated chlorine dioxide at a predetermined flow rate from the activation system to the static mixer;

a valve, disposed between the water source and the static mixer, that is in electrical communication with the controller and is opened upon command from the controller when the pump is commanded to pump the concentrated chlorine dioxide from the activation system to the static mixer;

a regulator disposed between the static mixer and the water source for controlling the flow rate of the water to the static mixer for diluting the concentrated chlorine dioxide to the predetermined concentration; and,

wherein the disinfectant solution is delivered at the predetermined concentration to the hand-held applicator upon activation of the pump and opening of the valve.

12. A system for cleaning teats of multiple milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started, the system comprising:

an aqueous chlorine dioxide disinfectant solution source provided at the parlor area;

a hand-held applicator having a housing volume within which a plurality of rotatable brushes are positioned for engaging a teat of the milk-producing animal having been inserted in the housing volume for cleaning;

a delivery station in fluid communication with the hand-held applicator and the disinfectant solution source, for delivering the disinfectant solution to the housing volume of the hand-held applicator with a predetermined concentration of an active disinfectant compound in the disinfectant solution;

a controller, in electrical communication with the hand-held applicator and the delivery station, that is configured to simultaneously initiate the rotations of the brushes and delivery of the disinfectant solution to the hand-held applicator; and,

US 8,402,920 B2

15

wherein the hand-held applicator is remotely operable relative to the disinfectant solution source and at least one first brush engages an end of the teat through which milk is released and the at least one first brush includes an array of bristles including a first set of bristles having a first radial length and a second set of bristles having a second radial length that is longer than the first radial length.

**13**. The system of claim **12** wherein the brushes comprise at least one second brush that engages an area of the teat above the end of the teat engaged by the at least one first brush.

**14**. The system of claim **13** wherein the bristles on the first and second brushes are composed of nylon fibers and the brushes are rotated at a rotational speed of up to about 900 rpm for cleaning a teat.

**15**. The system of claim **12** wherein the predetermined concentration of chlorine dioxide in the solution delivered to the hand-held application is about 100 ppm to about 200 ppm by volume.

**16**. The system of claim **12** wherein the predetermined concentration of chlorine dioxide in the solution delivered to the hand-held application is about 150 ppm by volume.

**17**. A method for cleaning teats of multiple milk-producing animals during a milking operation, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before the milking operation is started, the method comprising:

providing a source of an aqueous chlorine dioxide disinfectant solution at a location within or at the parlor;

delivering, for a first predetermined time duration, the aqueous chlorine dioxide disinfectant solution containing a predetermined concentration of about 150 ppm to about 200 ppm of chlorine dioxide by volume to a housing of an hand-held applicator having a teat inserted within a volume of the housing and the applicator having movable scrubbing elements in the housing element;

simultaneously actuating the scrubbing elements for cleaning the teats in the presence of the solution for the predetermined time duration, wherein the applicator is remotely operable relative to the solution source; and,

wherein the scrubbing elements include a rotatable brush disposed in the housing for engaging an end of the teat through which milk is released, and the brush includes an array of bristles including a first set of bristles having a first length and a second set of bristles that have a second length that is longer than the first length.

**18**. The method of claim **17** wherein the step of providing the source of the disinfectant solution comprises providing the solution with chlorine dioxide at a higher concentration than as delivered to the hand-held applicator, and diluting the disinfectant solution to the predetermined concentration before the solution is delivered to the hand-held applicator.

**19**. A method for cleaning teats of multiple milk-producing animals, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before a milking operation is started, the method comprising:

16

providing a source of an aqueous chlorine dioxide disinfectant solution at a location within or at the parlor by providing the solution with chlorine dioxide at a higher concentration than as delivered to the hand-held applicator, and diluting the disinfectant solution to the predetermined concentration before the solution is delivered to the hand-held applicator;

delivering, for a first time duration, the aqueous chlorine dioxide disinfectant solution containing a predetermined concentration of about 150 ppm to about 200 ppm of chlorine dioxide by volume to a housing of a hand-held applicator having a teat inserted within a volume of the housing and the applicator having movable scrubbing elements in the housing volume; and,

simultaneously actuating the scrubbing elements for cleaning the teats in the presence of the disinfectant solution for the first time duration, wherein the applicator is remotely operable relative to the solution source;

providing control logic in electrical communication with a motor that drives the scrubbing elements, in electrical communication with a pump that is in fluid communication with the solution source and in electrical communication with a valve, which is in fluid communication with a water source; and,

wherein the control logic is configured to simultaneously activate the motor, activate the pump and open the valve to dilute the concentrated solution to the predetermined concentration, deliver the solution at the predetermined concentration of chlorine dioxide and actuate the scrubbing elements for the first predetermined time duration.

**20**. A method for cleaning teats of multiple milk-producing animals prior to a milking operation, wherein the animals are housed in a parlor area and the teats are cleaned or disinfected before the milking operation is started, the method comprising:

providing a source of an aqueous chlorine dioxide disinfectant solution at a location within or at the parlor;

delivering, for a first time duration, the aqueous chlorine dioxide disinfectant solution containing a predetermined concentration of about 150 ppm to about 200 ppm of chlorine dioxide by volume to a housing of a hand-held applicator having a teat inserted within a volume of the housing and the applicator having movable scrubbing elements in the housing volume; and,

simultaneously actuating the scrubbing elements for cleaning the teats in the presence of the solution for the first time duration, wherein the applicator is remotely operable relative to the solution source;

actuating the scrubbing elements for a second time duration after the first time duration has elapsed in order to dry the teats.

**21**. The method of claim **20** wherein the second time duration is of a sufficient length of time so that some residual solution remains on the teat.

**22**. The method of claim **20** wherein a residual amount of disinfectant solution remains on the teat after the second time duration elapses.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

On the 13th day of April, 2015, I filed the foregoing Appellants' Brief  and Addendum electronically with the Clerk of Court via the Court's CM/ECF System. The following counsel of record were automatically served copies of said Brief by said CM/ECF System, via email.

Amber N. Davis, Esq.
Beusse, Wolter, Sanks, Mora & Maire, P.A.
390 N Orange Avenue
Orlando, FL 32801

Email: adavis@iplawfl.com
Fax: 407-926-7720

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

April 13, 2015

_____/s/ Michael T. Hopkins_____.
Michael T. Hopkins

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [      *8,350*      ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☐    The brief has been prepared in a proportionally spaced typeface using
[                    *Apple Pages, ver. 5.5.2*                    ] in
[                    *14 pt Times New Roman*                    ], or

☐    The brief has been prepared in a monospaced typeface using
[        *state name and version of word processing program*        ] with [
[    *state number of characters per inch and name of type style*    ].

/s/ Michael T. Hopkins
_____
(Signature of Attorney)

Michael T. Hopkins
_____
(Name of Attorney)

Attorney for Appellants
_____
(State whether representing appellant, appellee, etc.)

April 13, 2015
_____
(Date)